### THE MARTHA E. WALLACE.

#### DUNNING et al. v. BUCKALOO et al.

(District Court, S. D. New York. June 5, 1906.)

COLLISION—SCHOONERS CROSSING AT SEA—NEGLIGENT LOOKOUT.

A collision at sea in the night between the schooners Reiche and Wallace, which approached each nearly head on but on slightly crossing courses, *held*, on conflicting evidence, due solely to the fault of the Reiche, which was sailing free, and therefore bound to keep out of the way, and held the burden of proof, on the ground that she failed to see the lights of the Wallace until just before the collision, when the vessels were not more than a cable's length apart and then starboarded her helm, although the Wallace was showing her red light, when, the night being clear and the sea smooth, she should have seen the lights some 20 minutes before and observed them from that time. The Wallace *held* not in fault for not showing a flare-up, as permitted but not required, by article 12 of the international navigation rules (Act Aug. 19, 1890, c. 802, 26 Stat. 320 et seq. [U. S. Comp. St. 1901, p. 2867]), but showing a lantern instead, having the right to suppose that her lights were seen until almost the last minute, nor because of a change of course immediately before the collision.

In Admiralty.

Robinson, Biddle & Ward and William S. Montgomery, for Buckaloo and others.

Wing, Putnam & Burlingham, for Dunning and others.

ADAMS, District Judge. These are cross-actions to recover the damages caused by a collision which occurred between the schooners Martha E. Wallace and Fannie Reiche, about 14 miles to the northward and eastward of the Winter Quarter Shoal Light, off the coast of Virginia, on the 23rd day of December, 1905, about 7.40 o'clock P. M. The night was dark but clear. A north north-west wind prevailed, of moderate force. The Wallace was bound from Brunswick, Georgia, to New York, with a cargo of lumber, under and on deck. The Reiche was bound from Philadelphia to Savannah, Georgia, with a cargo of acid phosphate, all under deck. The Wallace struck the Reiche on the starboard side between the main and mizzen rigging, causing her to sink within a few minutes. Damages are claimed on

her behalf of $26,129.25. The Wallace was also injured by the blow to a small extent. Damages are claimed on her behalf of $1,300.

The Reiche was a three masted schooner, 146 feet long and of 440 tons net register. She was making between 4 and 5 knots per hour. The libel, and the answer in the cross suit of the Reiche, allege that for some time before 7.40 P. M. she was approaching the neighborhood of the Winter Quarter Shoal, with her regulation lights set and burning brightly, carrying all sail and steering by compass S. S. W. with the wind N. N. W., the sea being calm; that the night was not foggy but very dark; that the master of the Reiche was on watch, having a competent man at the wheel and a competent lookout stationed on the forecastle head diligently attending to his duty; that shortly before 7.40 P. M. a white light was seen by the lookout on the starboard bow but immediately afterward it disappeared and the schooner held her course; that a short time there-after a red and white light were also seen on the starboard side and almost immediately thereafter the loom of the sails of the Wallace came into view, as said Wallace swinging to the eastward bore rapidly down on the starboard side of the Reiche; that the master of the Reiche immediately ordered her helm put up and the boom tackle of her fore and mainsails loosened, but before the latter order could be fully obeyed the Wallace struck the Reiche and on the starboard side forward of the mizzen rigging, almost at right angles, inflicting such damage that the crew of the Reiche had barely time to escape with their lives from their own rigging over the bowsprit of the Wallace, while the Reiche subsequently sank and became with all her cargo and equipment a total loss. It is further alleged that the Wallace was in fault for the collision because (1) she did not hold her course, (2) she had no, or no sufficient lights, (3) she, when approaching the Reiche, exhibited an illegal and unauthorized light, to wit, a white light, (4) she maintained no, or no proper, lookout.

The Wallace was a 4 masted schooner 201 feet long and of 1007 tons net register. She had all her sails set and was making between 3 and 4 miles an hour. Her answer, and her libel in the cross suit, allege that she left Brunswick on November 29th, 1905, fully manned and equipped, and on the night of December 23rd, which was clear but dark, she was on the port tack, close hauled, heading about N. E. with the wind about N. N. W.; that her regulation lights were properly set in the fore rigging, and were burning brightly at all times before the collision; that she was under easy sail; that a little after 7 o'clock a light was reported on the port bow which appeared to be a sailing vessel running free, but yawing so much as at times to show the green light, and then at intervals the red light; that the Wallace kept her course as required, but, seeing the approaching vessel had changed her course showing only a green light very close aboard, so that she would not go clear, the master ordered the second mate to show a lantern, under Article 12 of the Regulations to Prevent Collisions at Sea, so as to attract the attention of the other vessel; that the lantern was promptly waved on the port side of the deck of the Wallace, abaft the fore rigging, to warn the people on

the other schooner; that the approaching schooner, however, continued to starboard her helm, coming directly across the Wallace's bow, making a collision unavoidable; that the master of the Wallace then ordered the wheel hard down to deaden the vessel's way and ease the blow, but before this could be completely executed, the vessels came together, the Wallace coming in contact with the other vessel between the main and the mizzen rigging, nearly at right angles; that those on the latter vessel then came over the Wallace's bow and reported that the vessel in collision was the Reiche, which soon disappeared and presumably sank. It is further alleged that the collision was due to faults of those on board the Reiche (1) in not keeping out of the way of the Wallace, (2) in not keeping a competent officer on deck, (3) in not having a sufficient lookout, or one able to speak the language of the officers and (4) in starboarding the helm, throwing herself in front of the Wallace, instead of seasonably porting her helm.

The vessels were approaching each other so that the Wallace exhibited her port side to the Reiche. The latter was yawing so that she exhibited first one and then the other of her side lights to the Wallace. If the Wallace exhibited her red light to the Reiche it was the latter's duty to avoid her, but she contends that at first the Wallace's red light was out so that it was not visible to the Reiche, and a close approach was made before she knew or could have known until too late that there was a vessel in her path. The determination of the question also involves one of proper lookout on the Reiche. The questions have been presented with great skill on both sides.

The argument for the Reiche may be summarized as follows:

There are three reasons why the Wallace should be held solely in fault for the collision: (1) because her port light was not properly burning, (2) because she changed her course, and (3) because she took no timely measures to avert the collision.

(1) The Wallace's port light was not burning.

While it is true that all the witnesses who were on the deck of the Wallace say that her lights were burning or were reported to be burning and that they never knew of the port light having gone out before the collision, the curious coincidence exists that the light was found to be out some hours after the collision and no one seems to know what was the cause of its going out.

The witnesses do not deny, as it might be expected they would, that the port light of the Wallace was seen before the collision but they say it was a bright light, i. e., that a white light was first seen some minutes before the collision and that just before the collision, they saw a red and white light and the lookout says that the white light was higher than the red. This story of the Reiche's seems to be corroborated by the fact that the Wallace admits that a lantern was used, especially so when the use of a lantern under circumstances such as the Wallace claims the situation presented is an absolute violation of the very article of the Rules, taken in connection with Article 1 of the Rules, under which the Wallace claims the lantern was shown.

We think that if the truth were told about the lights on the Wal-

lace, it would be, that when the Reiche was sighted the lookout was asked about the lights and he reported that the port light either was out or not burning brightly, that the second mate then went forward to see what the matter was and finding the light not showing, he went to the engine room, got a lantern and went up into the rigging to see what was the matter. It was then that the lookout of the Reiche saw a white light. The mate finding the light out, or needing attention, took it below. It was then that the white light disappeared to those on the Reiche. The side light was hurriedly attended to and again taken to the rigging with a white lantern to assist in putting it into place, and those on the Reiche then saw a red and white light. No one on the Wallace could explain why the light went out after the collision. The second mate was quite sure it was not because it needed filling, as he took it down and gave it to a man to be lighted and the man was not long enough away to allow it to be filled, and the man who lit it testified that he could see no reason why it went out and he did not fill it again.

Lights do not go out without some reason and the reason here is perfectly plain. When the light went out before the collision it was because there was no oil in it. In the hurry to get it back into place very little oil was put in and so it went out again. Curiously enough the man in charge of the lights does not say he filled the red lantern on the day of the collision but merely that he trimmed it.

As a general rule the testimony of a vessel regarding the events which took place there are to be accepted rather than the testimony of those from the other vessel but it has been said otherwise in some cases relating to lights, citing The Roman (C. C.) 14 Fed. 61, and The Monmouthshire (D. C.) 44 Fed. 697.

The Reiche was looking for lights because she was expecting soon to make the Winter Quarter Shoal Lightship, in about the direction from which the Wallace was coming. If the Wallace's port light was burning, it should have been seen by those on the Reiche as soon as the Reiche's green light is said to have been by those on the Wallace, i. e., some 20 or 25 minutes before the collision. The lookout did report a white light in about the direction from which the Wallace was advancing, and the master went forward and looked through his night glasses but saw no light. The whole testimony shows that the Reiche was navigated without reference to any red light and the men on her discovered the red and white lights at the same time, the Wallace being then close aboard on the port bow and all the Reiche could do was to go off. Had she luffed she would have gone right up into the Wallace. This red light when it was discovered was burning brightly and it is admitted by those on the Wallace that a white light was shown before the collision. They had to explain the presence of this white light and they do so by saying that it was shown under the authority of Article 12. This article does not permit the use of a lantern but confines it to a flare up light. The torch was there but the Wallace explains that it was not used because there was no time to light it. It is curious that the rule should say a flare up light when, according to the Wallace, it takes so long to light one.

148 F.—7

On the whole it seems that the only satisfactory explanation is that the port light of the Wallace was taken down after the Reiche's lights were seen and was replaced just before the collision. It is further urged that the Wallace changed her course and the collision can not be explained unless the Wallace changed her course to the starboard; that she was in fault for not taking some steps to avert the collision sooner than she did, as it is contended by the Wallace that those on the Reiche must have been asleep and the master of the former should have taken some action under Article 12 sooner than he did and it necessarily follows that the Reiche was not at fault, notwithstanding it was elicited what appeared to be an admission from the master of the Reiche that he starboarded because he thought the red light was the Winter Quarter Shoal Light, which is red, not red and white, and visible 12 miles. A captain would hardly begin to starboard for a light 12 miles away, especially as it was known to be stationary. The Reiche could not very well port to a red light close aboard and nearly broad on the starboard bow, such an action would inevitably throw her right up into the other vessel.

2. The Wallace changed her course.

The testimony of those on the Wallace is that she was steering a little higher than N. E. with the wind N. N. W. and that she did not change her course until the Reiche was seen to be across her bow, when her helm was put hard down and she came up into the wind 1 or 1½ points when the vessel struck.

Taking into consideration the evidence as to the Reiche's yawing and the distance and the bearing of her lights when first seen by the Wallace, and also the speed of the vessels, it is quite plain that they were on slightly crossing courses, being nearly head and head. It will be seen that the Reiche was yawing as much as one point on each side, that as the vessels approached she would at times show her red light. It was also apparent that had each held her course, the angle of the blow would have been 2½ points, whereas all agree that the vessels came together at right angles.

Obviously one, or both vessels, changed its course. The Reiche admits that she changed hers some 2 or 3 points, to the southward, but this would still only make the angle of the blow some 4½ or 5 points instead of 8. The Wallace says she only changed her course at the last moment and then to the windward about 1 or 1½ points. If this be true of course it would lessen the angle of the blow so that with the Reiche's change of 2 or 3 points to the southward and the Wallace's change of 1 or 1½ points to the northward, the angle of the blow would have been about 4 points.

The Wallace of course argues that the Reiche changed her course very much more than she admits. For a moment accept the Wallace's story that she changed about a point to the northward, then at the time of the collision she must have been heading about N. N. E. and in order that the vessels might come together at right angles the Reiche must have been heading E. S. E.; that is she must have changed her course about 8 points, from S. S. W. to E. S. E. But the wind was N. N. W. and the booms of the Reiche were held out

to starboard by the boom tackles and the witnesses say the sails of the Reiche except the spanker were aback. Such being the fact it would have been impossible for the Reiche to swing around to the eastward against the wind, the head sails would not have allowed her to do so.

The Reiche did not change her course until after she saw the white light on the Wallace, and the master of the Wallace says that this light was not shown until 30 or 40 seconds before the collision. It is inconceivable that a schooner of the size of the Reiche could jibe and come up into the wind, changing her course 8 points in 30 or 40 seconds.

There is testimony from the Wallace that is absolutely unexplainable if it be true that the Wallace only changed her course at the last moment and that change was to the northward.

The master of the Wallace says that when he first saw the Reiche's light, it was some 2 points on the Wallace's port bow and although he sometimes saw the red, yet all the time the lights of the Reiche were drawing ahead and narrowing in.

The master is supported in this statement by the second mate and lookout.

When vessels are on crossing courses as they were here, a light drawing ahead means but one thing, viz.: that the vessel which is drawing ahead will cross ahead of the other.

Then, in this case had each vessel kept her course the Reiche must have crossed ahead of the Wallace, but the Wallace says the Reiche changed her course to port just before the collision and the Reiche admits she did. Such a change of course on the part of the Reiche should have made the point of crossing further ahead, yet as a matter of fact the vessels collided.

The only way in which this state of affairs can be explained is that the Wallace changed her course to starboard; that she did not change her course was shown by the way the vessels came together.

3. The Wallace was at fault for not taking some steps to avert the collision before she did.

It is a very significant fact that immediately before the collision there was exactly the same excitement on the Wallace as there was upon the Reiche. What was done on the Wallace is more consistent with the supposition that she did not discover the Reiche sooner than the Reiche discovered her. But if we adopt her story that she had been watching the Reiche approaching without material change of course for 20 minutes until she was within one or two lengths, then the failure to take earlier or more effective precautions to avoid the collision was a gross fault, especially if the master thought, as he says he did, that everybody was asleep on the Reiche.

The very answer of the Wallace convicts her of this fault. It says:

"The 'Wallace' kept her course as required, but, seeing that the approaching vessel had changed her course showing only a green light very close aboard so that she would not go clear, the master ordered the second mate to show a lantern, under Article 12 of the Regulations to Prevent Collisions at Sea, so as to attract the attention of the other vessel. The lantern was promptly waved on the port side of the deck of the 'Wallace' abaft the fore

rigging, to warn the people on the other schooner. The approaching schooner however continued to starboard her helm, coming directly across the 'Wallace's' bow, making a collision unavoidable. The master of the 'Wallace' then directed to put the wheel hard down, to deaden the vessel's headway and ease the blow; but before this could be completely executed the two vessels came together, the 'Wallace' coming in contact with the other vessel between the main and mizzen rigging nearly at right angles."

This does not agree with counsel's original statement which says the lantern was shown before the Reiche changed her course; but the statement in the answer and the master's testimony show the fault of the Wallace even more clearly than the original statement, because it would hardly be expected that the Wallace would starboard her helm to a red light slightly on the port bow.

It is clear from the testimony of the Wallace that the Reiche was nearly ahead when the Wallace showed the lantern, and if the answer is to be accepted, it is equally clear that those on the Wallace knew that the Reiche was attempting to cross her bows. What good would showing a lantern or even a flare up do then? The Reiche had already starboarded. The story of waving a lantern is a mere subterfuge to cover the real reason it was there.

When the master ordered the lantern shown he says the vessels would not go clear. What he should have done was to have acted at once with his helm, instead of fooling around with a lantern which could not possibly have any effect as the other vessel had already changed her course. He should have ordered his helm hard down when he saw the Reiche shut in her red light and show her green instead of waiting until the vessels were practically together as he did. Can there be any doubt, considering the Reiche was struck only 50 feet forward of the stern, that the Wallace would have cleared the Reiche had her helm, when the red of the Reiche was shut in and the green shown, been ordered hard down, thus deadening her headway and throwing her astern of the Reiche.

It is true that the privileged vessel must keep her course and speed but this she can not do to the extremity of collision when she has noticed that the burdened vessel will fail in her duty.

All the testimony of the master of the Wallace shows that he had ample notice of the failure of the Reiche to do her duty (though such failure was due to the fact that the red light on the Wallace was out) he should have acted in a seamanlike way. This he failed to do. Even if the Wallace did not change her course to starboard, she at least failed to change to port when she saw that if she kept her course a collision would be unavoidable.

Article 12 permits the use of a flare up when necessary to attract attention. The master of the Wallace constantly reiterates the accusation that from her actions he thought every one on the Reiche was asleep. If this is true he should have taken some action about showing a light under Article 12 sooner than he did. Had he done so there would have been plenty of time to light the torch and thus have attracted the attention of the Reiche and so have avoided the collision.

The Reiche was not at fault.

This necessarily follows if what we have said about the Wallace's faults be true and it only remains for us to notice counsel's argument that the Reiche changed her course because she thought the red light of the Wallace was the Winter Quarter Shoal Lightship.

Counsel for the Wallace by some very clever questioning obtained what appears to be an admission from the master of the Reiche that he starboarded because he thought the red light was Winter Quarter, and then based a fanciful argument upon it.

Winter Quarter is visible 12 miles and the character of the light is red not red and white. The captain would hardly begin to starboard for a light 12 miles away. Why too should he starboard to a light-ship on his starboard bow? The lightship was stationary and if it were on the starboard bow, there would be no danger of running into it. Counsel says the schooner did not wish to get inside of the light on account of the shoal water, but there is over 5 fathoms for 6 or 7 miles inshore of the lightship, Winter Quarter being to the N. W. of the lightship and certainly the schooner could not get inshore of the lightship with the light broad on her starboard bow, and the schooner steering S. S. W.

Counsel also argues that the starboarding of the Reiche to a red light was an unusual thing to do but she could not very well port to a red light close aboard and nearly broad on the starboard bow. Such an action would inevitably throw her right up into the other vessel.

An additional brief in reply to the Wallace's brief was filed and has been considered, but it does not seem advisable to occupy the space necessary to summarize it. The substance of the brief of the Wallace is hereinafter set forth and forms the basis of the conclusion to which I have come, somewhat doubtfully, it is true, but sufficently persuaded to reach the result that the Wallace should succeed in her general contention that she was not, and that the Reiche was, in fault for the collision, especially as the latter was sailing free and failed to avoid a vessel sailing on the wind with the right of way, The Freddie L. Porter (C. C.) 8 Fed. 170; The Gypsum Prince, 67 Fed. 612, 14 C. C. A. 573.

The Wallace had a full complement of officers and crew, of whom six were, or came, on deck, as the Reiche approached. These were the master, two mates, the lookout, the wheelsman, the engineer and steward, all of whom were examined, either by deposition or on the trial in court. The masters of both vessels were examined before me.

The Wallace was on the wind, her booms having been hauled flat aft at about 6.10 o'clock. Thereafter she did not steer a compass course but was kept by the wind, which earlier was N. W., then came N. W. by N. and gradually canted more northerly being about N. N. W. at the time of collision. The Wallace could sail within 5½ points of the wind. Before the collision, she headed about N. E. ½ N. While this was her compass course she was probably making a ½ point of leeway.

The lookout of the Wallace saw and reported the Reiche some 20 minutes before the collision. She was then about 3 points on the

Wallace's port bow. She was from that time steadily under observation by the master and 2nd mate and lookout of the Wallace, which held her course. The Reiche as she approached first showed her green light, then a red light, then both lights, then a green, then a red, then both and at last the green alone, always on the Wallace's port bow, but narrowing in as she got nearer, and drawing somewhat ahead. It was evident that the approaching vessel was yawing considerably and not apparently paying attention to the Wallace and the master of the latter, who had come on deck when the lookout reported the first light, sent the 2nd mate to examine the Wallace's lights. He went and did so, found the lights burning brightly, and so reported.

As the Reiche approached the Wallace, the latter was about ahead, with her port light in view. Those on the Reiche did not, however, see this light until the vessels were within a distance of probably 1000 feet, when the red light of the Wallace was seen and the Reiche put her helm up and fell off, keeping the helm so till the collision occurred, at substantially right angles.

No flare up light was shown or detonating signal used by the Wallace, because it is alleged that there was no time for compliance with the terms of Article 12. Instead thereof, an ordinary globe lamp, which was already lighted and hanging in the engine room forward, was taken by the mate to the port side of the vessel and waved to the Reiche for some little time, estimated by him at 2 or 3 minutes, but probably much less.

The doubt in the case, mentioned above, is due to the exhibition of this light as well as the question of the burning of the red light of the Wallace. It appears that at about 11 o'clock, the red light went out without any apparent cause and it is argued for the Reiche, as appears above, that it was out when the vessels came within a distance which permitted a view of lights and hence was not seen, and that it was relighted just before the collision.

With respect to the torch, its exhibition is not mandatory, and while doubtless as a matter of precaution it should be used whenever it appears to those on board of a vessel that another is approaching so that danger of collision exists, yet there was no way of knowing that the Reiche did not see the red light, and hence no reason for the use of a torch until the collision was practically unavoidable. The use of the additional light did not apparently do any harm.

While the circumstances relating to the red light are suggestive of there being some trouble with it so that it may not have been showing properly, yet the evidence that it was burning at all times during the Reiche's approach is too clear to admit of reasonable doubt of such being the fact. The lookout of the Wallace, a seaman of 21 years of age, testified that he looked at the Wallace's lights during the approach of the Reiche and they were burning brightly. The second mate also testified that he looked at them during the approach and found them so. These witnesses so reported the light at the time to the master, and the fact that the light was actually seen on the Reiche before the collision corroborates these witnesses to some ex-

tent. It does not seem that the testimony can be overcome by suppositions that the light was not burning unless they find strong corroboration from some source.

If such corroboration exists, it would naturally be found in the testimony of the Reiche. The only witness from her who was advantageously placed to see lights on the Wallace was the lookout. He was a boy of 19 years of age, a Finn, with an insufficient knowledge of English to testify without an interpreter, although the master said of him that when directed concerning sea terms and navigation, he understood them very well. He had had about 5 years experience at sea but only 7 months on American vessels. He said that he went on lookout duty on the forecastle head at 6 o'clock; that the first light he saw from there was a fixed white light more than 3 points on the starboard bow; that he continued to see for about 5 minutes when he could not see it any more; that he reported it by singing out "Light on the starboard" and the master came forward with the glasses and asked what the bearing of the light was but he could not see it, nor could the witness then. In response to a question what he meant by saying that he saw it for 5 minutes, he said that it was impossible for him to say how long it was but the master came at once. He further testified that afterwards he saw a red and fixed white light but could not tell which was nearer to him but the white light was a great deal higher than the red; that he sung out to the master "Light on the starboard" and then ran aft because it might be that the master could not hear him; that he thought the lights were a steamboat's; that the master then told him to call all hands on deck, which he did, and they came up; that at that time the head gear of the other vessel was over the deck of his vessel and the captain ordered all hands to jump on the other vessel and they did so by going over the head gear. On the cross, he said that the master stayed forward about 10 minutes, then went straight aft again; that when the witness got aft he was close to the man at the wheel who was turning it when he arrived and got it hard up; that he continued to see the red and the white light when he got aft. He explains that he saw the red light close at hand and thought the master could not hear him call out on account of the wind. So he ran aft to be sure of the master hearing him; that he knew the master was 10 minutes on the forecastle head, but could not otherwise give reliable estimates of time.

Taken altogether the lookout's testimony does not give much help in solving this difficult question, and the other testimony from the Reiche also is not of appreciable aid.

The master said that when the lookout first reported a white light about 3 points on the weather bow, he (the master) looked all around the horizon with the glasses but could not see it and went forward to ask the lookout about it; that the lookout could not then see it and he (the master), after looking around again, cautioned him to keep a good lookout and went aft; that the view on the weather side was perfectly unobstructed and the next thing that occurred was the lookout reported a light on the weather bow and simultaneously he and the man at the wheel saw a white light and then a red light so

close together that those aft could see them together; that the lights were distant about 2 ships' lengths and he ordered the wheel put up and helped in the operation; that the wheel had the effect of keeping the vessel off before the wind, so that the foresail and mainsail had become becalmed and were only prevented from going over on the other side by the boom tackles which still held them, but the spanker was full on the port side. The master estimates the time of the first report about 5 or 7 minutes before the collision and the last report a minute or two.

The master's testimony is corroborated in a general way by the man who was at the wheel.

The mate of the Reiche who was below during the approach, came up when the master ordered all hands on deck and then saw a red light right on the beam of his ship, a cable's length, about 600 feet away.

The Reiche was yawing considerably, it is said from ½ to a full point, possibly more, so that if the Wallace's light got on the lee side of the Reiche, it may have been obscured by her sails to those aft and the only person on the Reiche who had a continued view was the lookout. I do not, however, attach much importance to such suggestion, as it is probable that the light was always far enough on the weather side of the Reiche to give all on deck a continued view.

It seems to be a case justly falling within the principle stated by Dr. Lushington, The Vivid, 7 Notes of Cases, 127, 130, as follows:

"Parties may swear that they did not see a light, but that never can be received as evidence in opposition to those who say that they showed a light; because both statements may be true. The light may have been exhibited, and those on board the steamer may not have seen it."

In a collision between sailing vessels, one sailing free and the other close hauled, the circuit court of appeals for this circuit, held that the vessel sailing free was solely in fault. The Queen Elizabeth, 122 Fed. 406, 59 C. C. A. 345. An extract from the opinion of Coxe, J., is as follows (page 408 of 122 Fed., page 347, of 59 C. C. A.):

"We have no doubt as to the negligence of the Birdsall. If her crew had been competent, alert and watchful they certainly would have seen the ship's red light before it was 'right abreast' on the 'starboard beam.' Danger of collision was then imminent, the time was, probably, less than two minutes, the distance less than four lengths. The evidence that the ship's lights were burning brightly is overwhelming and if the lookout had been attentive he could have seen the red light twenty minutes prior to the collision and when the ship was miles distant. His failure to do this on a clear night was unquestionably a fault."

Even if the several persons on the Reiche had been observant, still their failure to see the red light of the Wallace which has, I think, been proved to have been shown, would not exculpate the Reiche from blame. It has recently been said in the circuit court of appeals, in The Helen G. Moseley, 128 Fed. 402, 403, 63 C. C. A. 144, 145, opinion by Lacombe, J., as follows:

"Manifestly the proximate cause of the accident was the failure of those on the steamer to discover the red light of the schooner until she was within one length of them. Judging from the event, the navigator of the steamer would have used better judgment, had he at once ported to the

schooner's red light, but that bit of navigation came so close to the collision that it need not be considered. The brief moment left in which to navigate was primarily responsible, and its briefness was the result of failure to make out the schooner earlier. The second officer was in charge of the steamer's navigation. The boatswain was on the bridge with him, performing there the duties of a junior officer. The quartermaster had served in the German navy; the lookout, in the German army. All were experienced men, and had undergone special eyesight examination. The captain was also on deck, but he had returned so recently after a momentary absence in the chartroom to work out an observation, taken to ascertain location off shore, that he should not be counted among the watchers for lights. It is difficult to understand how such a body of officers and men, at the beginning of their watch, could have failed to see the red light earlier, if it had been visible. The circumstance that it was lower than the plane of observation of the lookouts, that there was still an easterly sea, that several other lights had recently been seen and kept under observation, thus tending to distract attention, seem hardly sufficient to account for a temporary aberration, lasting some minutes, on the part of four competent observers simultaneously. Nevertheless individual aberrations of sight and attention do occur, even among the ordinarily careful, and, however, enormous the odds may be against such a simultaneous occurrence among four persons, the combination is possible. Therefore, under well-settled principles, unless there can be shown some cause, due to the schooner, why her red light was not shown to the steamer until in the very jaws of the collision, the conclusion must be that the steamer was in fault."

Those on the Wallace had a right to assume that her lights would be seen by the approaching vessel up to nearly the last minute. Article 12 did not impose a burden upon the Wallace. That article has recently been discussed in this circuit in The Robert Graham Dun, 107 Fed. 994, 47 C. C. A. 120. The court there said, in an opinion by Wallace, J. (page 995 of 107 Fed., page 121 of 47 C. C. A.):

"It is contended in behalf of the steamship that the schooner was in fault for not displaying to the steamship a flare-up light, and for that reason, even though the steamship was in fault for the collision, the loss should have been apportioned by the decree between the two vessels. The contention is founded upon article 12 of the international regulations of 1890 for preventing collisions at sea. It provides as follows:

'Every vessel may, if necessary in order to attract attention, in addition to the lights which she is by these rules required to carry, show a flare-up light or use any detonating signals that cannot be mistaken for a distress signal.'

This rule is not imperative by its terms, but permissive. Possibly it was enacted to relieve a vessel not being overtaken by another from imputation of fault for displaying a signal which an overtaken vessel is required to display by the provision of article 10. It is the duty of every vessel to exercise any precaution known to the ordinary practice of seamen for preventing a collision or alleviating its consequences, as well as those which are specifically prescribed by the rules. If those in charge of the schooner had known that her lights had not been seen by the steamship, and had apprehended that the latter would not, for that reason, seasonably undertake to perform her obligations, it would have been their duty to adopt any of these precautions which lay within their power. But they had no reason to apprehend this until the steamship shut out her red light and showed both her lights. Then the schooner's master, who was on deck, went forward and looked at his lights. Having found them showing brightly, he was reassured, and had a right to expect that they would be observed by the steamship, and to assume that she would make the necessary maneuvers to avoid his vessel, until he saw that it was too late for her to do so. If she had made such maneuvers two minutes before the vessels came together, there would not have been a collision, as the vessels, at the rate of speed at which they were approaching one another, would have been about 2,800 feet apart. If there had been time

for him to have procured and exhibited a flashlight after he ought to have assumed that the steamship would not perform her duty and avoid his vessel, it is not surprising that in the excitement and confusion of the moment he did not think of doing so, and the omission to do so would have been excusable as an error in extremis. The argument made in behalf of the steamship, that he was bound to apprehend danger throughout the 15 minutes preceding the collision does not commend itself to us as having any reasonable basis."

In the cases cited by the Reiche on the question of the red light burning, there was no testimony to show that the light was actually seen to be burning by those on the other vessel before the collision, as was the case here. Of course it is insisted by the Reiche that the red light of the Wallace must have been out or it would have been seen sooner by those on the Reiche but it appears that the fact of its not having been at all times seen is more consistent with some inattention on the part of those on the Reiche then its being out at any time during the approach of the vessels.

With respect to the alleged fault of the Wallace's change of course, it appears that she did not change till just before the collision. Her original heading was about N. E. It may have varied slightly from that, but probably not more than $\frac{1}{4}$ of a point, so that when the Reiche approached, the Wallace was sailing substantially N. E. and so continued until it was seen that a collision was unavoidable, when she put her wheel up and turned somewhat to the eastward, probably $1\frac{1}{2}$ points. The Reiche swung from a heading of S. S. W., or S. by W. $\frac{1}{2}$ W., until the collision when she was heading at about right angles to the Wallace's heading of N. E. by E. $\frac{1}{2}$ E., or S. S. E. $\frac{1}{2}$ E. This seems to be shown by the fact that the swing of the Reiche was continued until her sails were aback, although some of them were still held to port by the tackles. As her sails in this condition naturally ceased to propel her this might easily mislead those on the Reiche into supposing that the Wallace was suddenly drawing closer. The wheelsman of the Reiche said that her heading was S. by W. $\frac{1}{2}$ W. when he put the wheel up, but still when his vessel was struck she was headed exactly S. $\frac{1}{2}$ W. just one point off the course of S. by W. $\frac{1}{2}$ W. This was apparently not truthful on the part of the wheelsman and tended to discredit his general testimony.

There is a feature of the case that has not been adverted to herein and may be of some importance. It is urged by the Wallace that the Reiche was in fault for starboarding her helm. It does not seem that this was in extremis. As has just been said the Reiche probably fell off to about S. E. in order to bring the wind on the port side of the sails and put them aback, a change of about 6 points. When this change began, it is conceded that the red light of the Wallace was a cable's length off. It is, of course, fatal to starboard to a red light upon a moving vessel and the master recognized this but said that if he had ported his helm he would have run into the Wallace, they were so close. Subsequently, however, he said that he was expecting to make the light of Winter Quarter Shoal, a red light, and that when he saw this light he did not know whether it might be that Light Ship or not; that if it were that light it would be natural for him to go outside

of it to the eastward and such would be a good reason for him to put his wheel up and leave the light on his starboard side. He was then asked: "Q. When you first saw the red light you put your wheel up, partly with that in view, didn't you?" and said: "Yes, Sir." It may be that this was the real reason for starboarding the helm. The place of collision was only about 14 miles N. E. of the light on the shoals, and the range of visibility of that light is 12 miles. If the master thought the light was on the shoal, it affords a probable explanation of what was otherwise an unseamanlike thing to do, that is to turn his vessel in the direction of a light he was required to avoid.

While the case is a difficult one to determine, the law, in connection with foregoing considerations, seems to require a decision in favor of the Wallace.

There will be a decree dismissing the libel of the Reiche and one providing for a recovery of the Wallace's damages.