## UNION SHIPPING & TRADING CO., LIMITED v. UNITED STATES.

### No. 200.

Circuit Court of Appeals, Second Circuit.

April 27, 1942.

Eugene Underwood and Burlingham, Veeder, Clark & Hupper, all of New York City (Chauncey I. Clark, of New York City, of counsel), for appellant.

William E. Collins and Mathias F. Correa, U. S. Atty., both of New York City, for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The libellant appeals from a decree in admiralty holding the respondent solely liable for a collision between the libellant's ship, "The Reims," and the respondent's ship, "The Berwind," in a fog in the River Gironde on April 25, 1918. The respondent filed cross assignments of error. The libellant's appeal is because the judge limited its damages; the respondent complains because he did not hold "The Reims" at fault as well as "The Berwind"; also because he did not limit the damages more narrowly than he did. The question as to the extent of the damages arises because after "The Reims" had been struck where she lay at anchor, she steamed up the river towards her destination, Bordeaux, but, after proceeding a short distance, was ordered to be put ashore outside the channel. This she did twice and suffered much the greater part of her injury in so doing. The judge, for reasons that will appear, allowed her to recover for all injuries except those suffered from the second grounding; and the appeal is from the interlocutory decree so declaring and sending the cause to a commissioner to compute the damages on that basis.

The facts—all the findings of which we accept—were as follows. Both ships had been in a convoy bringing coal for military uses in France; they had anchored off the mouth of the Gironde and were to find their way separately about sixty miles upstream to Bordeaux where they would unload. "The Reims" started ahead of "The Berwind," but was overtaken by a dense fog after she had gone some twenty miles. Thinking it best to anchor, she turned to starboard until she reckoned herself outside the channel, anchored and rang her bell at intervals as prescribed by the rules. The respondent challenges the finding that she anchored on the western edge of the channel, where her master swore that he found her when the fog lifted; i. e. on a line between two marking buoys. But the master's testimony reads clear and true and the fact that he mistakenly marked his positions on a later chart when first examined, on deposition, did not impugn his credibility in the slightest. The important thing was that each time he placed the ship on a line marked by buoys, whose change in position between the dates of the two charts he would be most unlikely to notice. "The Berwind" followed "The Reims" about half an hour later; and finding herself caught in the same fog, she too turned to starboard seeking an anchorage outside the channel, blowing regulation fog whistles meanwhile. In so doing she struck "The Reims"—which had headed downstream on the flood—on her starboard side forward of amidships. "The Berwind's" fault is conceded, but the respondent argues that "The Reims," even though she was out of the channel, was at fault for failing to give some other signal than by her bell, after she had heard the whistle of "The Berwind" approaching for some minutes as she had. We think that the judge very properly overruled this contention. While

the Twelfth International Rule, 33 U.S. C.A. § 82, does indeed allow a ship, "if necessary," to "show a flare-up light or use any detonating signal that can not be mistaken for a distress signal," "under all ordinary circumstances, a vessel discharges her full duty and obligation to another by a faithful and literal observance" of the International Rules. The Oregon, 158 U.S. 186, 202, 15 S.Ct. 804, 811, 39 L.Ed. 943. Article Twelve has been before us several times and we have never held it a fault not to give an added signal. The Robert Graham Dun, 2 Cir., 107 F. 994; The Lafayette, 2 Cir., 269 F. 917, 924; The Cherokee, 2 Cir., 45 F. 2d 150. See, also, The Martha E. Wallace, D.C., 148 F. 94, 105. There was not the slightest reason for "The Reims" to apprehend .that "The Berwind" would strike her; although it is hard to tell the direction from which sound comes in a fog, "The Berwind's" signals seemed to be broadening on her bow, which was not a sign of immediate and pressing danger, but quite the opposite. We need not say that there can never be circumstances which may make it imperative for a ship to supplement the statutory signals; but ordinarily she need not, and ought not, for she will tend rather to prevent than to promote mutual understanding. If Article Twelve is ever to be treated as peremptory, it can only be so upon critical occasions when it is apparent that the usual signals have failed, and that if no more is done collision is sure to result.

"The Reims" was not severely injured by the contact, but the break was below the water-line and she began at once to make water, though she did not start her pumps for about an hour. Two or three hours afterwards the fog lifted and she broke ground and went on upstream.. Finding that the pumps would not keep down the leak, she stopped at an anchorage about three miles below the little village of Pauillac, which was being then used as a naval air base. It was in charge of a French naval official described in the testimony as a "port captain," whose authority and powers the record does not very certainly disclose. A United States naval officer who had been detailed to Pauillac a few weeks after the collision, but who obviously did not know much about the matter, swore that this official's powers were absolute as to the use of any docks at Pauillac; and he "imagined" that the pilots were under the port captain's direc-

tion; but he added that this did not include ordering a disabled ship where she should anchor. A commander of the United States Navy who had served at Pauillac during the year 1918 thought that a foreign ship's master was obliged to obey the orders of the port captain, though they had to pass to him through an American or British official on the spot. A former French naval officer undertook to declare the scope of a master's duties in the circumstances; obviously he had in mind the French law, of which he was not qualified to speak if it had been relevant, which it was not. The upshot of what he said was that while the port captain had authority to direct a ship to beach, he might not select the spot—a most improbable distinction.

The master of "The Reims," having anchored, went to Pauillac with the pilot and consulted the port captain and the British naval officer on duty there; he wished to be allowed to go to the docks, but this the port captain forbade. All four went back to the ship where, after a conference, the port captain told him that he was afraid that "The Reims" might sink in the channel and block it, and that he must put her ashore outside at a spot which he then picked out. He and the British officer then went back to Pauillac. This testimony the judge accepted and we should not be warranted in holding that his finding was "clearly erroneous." The master and pilot anchored "The Reims" over the selected spot where she "took ground heavily" at low water, later "bumping forward part on ground" as she swung on her chain with the flood. The grounding had not raised her enough to put the break above the water-line and allow the temporary repairs, which the master wished to make so as to get leave to go on to Bordeaux. He swore that in the early hours of the next morning he went again to Pauillac with the pilot and saw the port captain who then selected a second spot where he directed the pilot to beach the ship, and where she would show the break at low tide. The judge did not believe this part of the master's testimony, principally, as we understand it, because he thought that he had in his earlier deposition contradicted what he said in court. This seems to us scarcely a fair conclusion if all that he said upon the deposition be considered; for, while it is true that his direct testimony reads as though the choice of the second spot had been

his own, on his cross he spoke of his second trip to Pauillac in substantially the same way that he did on the trial. However, it must be owned that this part of the story seems somewhat improbable, and while, if we had only the record to go upon we should have believed the master, we are not prepared to upset the finding. Therefore we shall assume that the pilot selected another spot without the port captain's directions where he beached "The Reims" a second time; the master making no preliminary soundings. How far this spot was from the first does not appear, but the break was enough exposed at low water to allow temporary repairs. The river bottom was in general made up of mud and gravel, and the chart showed mud alone at various places; but at both groundings it was hard enough to damage the ship's bottom although nobody can tell how much of the damage was done each time.

 As to the first grounding, we agree with the district judge. The respondent argues first that the port captain had no legal power to direct "The Reims" to be put ashore outside the channel; and, second, that if he did, his order "broke the causal chain" and immunized "The Berwind" as tortfeasor. Although the judge analyzed the French law with care, it does not seem to us necessary to go into the question whether it justified the port captain's order. France was at war; the port captain was a naval officer confessedly in general charge of the .river at Pauillac and below; the master had but one duty and that was to obey his orders. A moment's consideration of the position in which he would have put himself had he refused to do so, backed as the port captain was by the local British naval officer, discloses that the respondent's position is altogether untenable. But the question would not be justiciable by us, even if unlawful compulsion were not an excuse. When public officers of a foreign country perform official acts in avowed pursuance of their authority, the court of another power will accept these acts as lawful and will not undertake to examine their validity under the local law. Hewitt v. Speyer, 2 Cir., 250 F. 367; The Claveresk, 2 Cir., 264 F. 276; Banco de Espana v. Federal Reserve Bank, 2 Cir., 114 F.2d 438, 443. The master was not therefore at fault; first, because he had no choice if the order had been unlaw-

ful, and second, because we may not declare that it was unlawful. It is another question whether the injury was one of those results of "The Berwind's" fault for which the respondent is liable. Beneath all the vast amount that has been written on the vexed question of "proximate cause," there lies (at least in the case of negligent wrongs) the feeling that, since the breach of duty involves only a lack of foresight, the liability should not extend beyond that foresight which ought to be exacted. In the case at bar, we think it not too remote a possibility with which to charge those on board "The Berwind," that if they should disable another ship of the convoy enough to make it possible that she might sink in the channel, the naval authorities would be likely to insist that she be beached outside, and that the beaching might injure her. Especially in the stress of war the same care cannot be counted on as when men have more leisure and act under less pressure.

 There is more doubt as to the second grounding, but still we think, even though we discredit the story of the second trip to Pauillac, that no fault should be imputed to the master. When the port captain declared that "The Reims" must not proceed towards Bordeaux as she rode, it implied either that the break must be temporarily patched, or that she must be enough unladen to bring the break above the water-line. In the end both were done; but the lightening did not begin until April 27th. The respondent's argument, which the judge accepted, is that, having once found the bottom bad, the master should either himself have sought a good bottom somewhere in the neighborhood, or should have waited till lighters were available to lighten him. It is of course true that the master was in general charged with finding a fair berth; but there was no reason for him to suppose that there was none available which would allow him to patch the break, and he did not yet know that even after doing so he would not be allowed to carry a full cargo to Bordeaux. Although he was obliged to beach "The Reims" outside the channel, he was free to seek shallower water than she had been in before. He left the choice of such a spot to the pilot, and it is for this that he has been held at fault, because he should himself have sought out a spot upon the chart marked "mud," or at least should have sounded the bottom,

as he did some days later. We think on the contrary that he was justified in leaving the selection of the spot altogether to the pilot.

■■ It is of course true that a master does not surrender his ship to a pilot and that there remain occasions when he must interfere and even displace him. The first case, so far as we know, came up in England in 1847, soon after the compulsory pilotage act was passed. The Gipsey King, 2 W. Robinson 537. It chanced to concern the proper catting of an anchor on a vessel in charge of a pilot, and Dr. Lushington, in excusing the owner because the catting was the pilot's, spoke as follows (p. 547): "It is, I apprehend, an established principle of law that the mode, the time, and place of bringing a vessel to an anchor, is within the peculiar province of the pilot who is in charge." Only three years later the Privy Council, speaking through Baron Parke (The Christiana, 7 Moore P.C. 160, 172), said of a compulsory pilot: "It was his sole duty to select the proper anchorage-place, the mode of anchoring and preparing to anchor." And still earlier on the same page: "The Pilot has, unquestionably, the sole direction of the vessel in those respects where his local knowledge is presumably required; the direction, the course, the manoeuvres of the vessel, when sailing, belong to him." In 1857 Dr. Lushington in The Argo, Swabey, 462, announced the limitation upon this which is generally accepted and which the Supreme Court recognized obiter in The China, 7 Wall. 53, 67, 19 L.Ed. 67; and again in somewhat truncated form in The Oregon, supra, 158 U.S. 186, 194, 15 S.Ct. 804, 39 L. Ed. 943. It was this: "a master has no right to interfere with the pilot, except in cases of the pilot's intoxication or manifest incapacity, or in cases of danger which the pilot does not foresee, or in cases of great necessity." He said further: "The navigation of the ship is taken out of the hands of the master and transferred to the pilot." All the decisions on which the respondent relies readily fall within this formula. Jure v. United Fruit Co., 5 Cir., 6 F.2d involved only the refusal of a charge to the jury, where the master had failed to warn the pilot "that, without a change of its course or speed" the ship "might cause a violent movement" of another on which the plaintiff was injured. In Charente S. S. Co. v. United States, 5 Cir., 12 F.2d 412, the court thought that there was enough evidence to submit to the jury that "danger from some cause" was "imminent though the particular cause of danger" might "not be appreciated." In Robins Dry Dock v. Navigazione Libera, 2 Cir., 32 F.2d 209, we held a master at fault who had done nothing for over four minutes during which the ship's engine had gone forward after the engine room had assented to a backing signal. In City of Los Angeles v. Standard Transportation Co., 9 Cir., 32 F.2d 988, apparently the master had failed to set the proper lookouts, a thing over which the pilot had no authority. All these but the last were occasions of emergency where it was apparent—or a jury might so have found—that the ship was pressing on into danger and that the pilot was doing nothing about it. There was nothing of the kind in the case at bar. It was not the pilot who had made the first mistake, but the port captain; the pilot merely followed his orders. Nor would it follow if he had made one mistake that he was "manifestly" without capacity. The master knew nothing of the bottom; the pilot was presumptively acquainted with it; that was one of the reasons he was on board. The situation was exactly of the type in which a master, not only need not, but must not, step in; "the place of bringing a vessel to an anchor" being "within the peculiar province of the pilot," a master should not invade it until he sees, which this master did not and could not, that it was being plainly misgoverned.

Decree modified to grant full damages, and affirmed as modified.