**UNITED STATES of America,**
**Libelant,**

v.

**The WESTERVELT, The CATHERINE MESECK and The GEORGE KEOGH and Meseck Towing Lines, Inc., Respondents.**

United States District Court
S. D. New York.
Nov. 15, 1955.

Paul W. Williams, U. S. Atty., New York City, for libelant, Gilbert S. Fleischer, New York City, of counsel.

Purdy, Lamb & Catoggio, New York City, for respondent, Edmund F. Lamb, New York City, of counsel.

WEINFELD, District Judge.

This libel was filed against Meseck Towing Lines, Inc. and three of its tugs to recover damages for the repair of a telephone submarine cable running from the Battery to Ellis Island allegedly resulting from the respondents' negligence. The damage was caused by the anchoring of the S.S. Coastal Liberator.

The Liberator, owned by the libellant, was being transported as a "dead ship" from Brewers Dry Dock in Staten Island to a loading berth in the East River, Brooklyn. She was being maneuvered by the three respondent tugs. One

tug was on either bow and one on the port quarter.

The Liberator was in command of her master, Captain Caldwell. The pilot of the tugs was also aboard the vessel from which he issued orders to his tug crew members. After leaving the dry dock the flotilla proceeded into the Kills of New York harbor, up the main channel off the Statute of Liberty and then as it neared Governors Island on the starboard side, a strong west or northwest wind of Force 5 or 6 suddenly came up. The tug on the starboard side was unable to cant the vessel's head into the wind and she drifted southeast towards Governors Island.

Although it was known to the master and the tug pilot that the convoy was over a cable area, the Liberator's anchor was dropped, allegedly to avoid collision with the rock wall of Governors Island. When the anchor was lifted it appeared that the fluke had fouled the cable. In an effort to disengage the cable the master of the Liberator maneuvered his ship, backing and filling, dropping and picking up the anchor, going hard right and hard left. After two hours of such activity he finally succeeded. Inspection later revealed damage over a wide area of the submerged cable, the repair of which cost libellant (which also owned the cable) $4,000, recovery of which is here sought.

The libellant claims the respondent and its tugs were negligent in failing to supply a sufficient number of tugs, or tugs of sufficient horsepower safely to perform the towage operation under the prevailing wind and tide conditions which were either known or should have been known, or in any event could reasonably have been anticipated, and that such failure was the proximate cause leading to the fouling of the cables. It also contends that liability for the anchoring incident rests upon the respondent.

█ Upon all the evidence, I am of the view that the libellant has failed to sustain its burden of proof.

The number of tugs to tow the vessel upon leaving the Staten Island dry dock was determined by officials of the libellant. Captain Caldwell testified that when he left dry dock the three tugs were "more than sufficient" under the then prevailing wind conditions to maneuver and shift the vessel with safety. A northwest wind blew up suddenly as the ship and tugs approached the East River off Battery Park in the vicinity of Governors Island. Captain Caldwell, in his deposition, described the events as follows:

"Q. And apparently it was just a sudden, extra gust of wind, or a particularly strong wind, at that particular time that you say simply took over the ship after you had gotten into the cable area, or else you would have anchored the ship before you got into the cable area? A. Yes.

"Q. Isn't that true? A. That's about it.

"Q. And both you and Mr. Duffy [the tug pilot] knew that you were in a cable area, and he said he hated like the devil to have the anchor there, and you said, 'Well, there's nothing else we can do,' and you are the one that gave the order to let go of the anchor? A. I remember that very, very clearly. I know Duffy was most reluctant to let that anchor go, and I said 'It is the only thing to do, let her go.' It was my responsibility.

"Q. It was your responsibility, and in other words, you were the one that had to make that final choice, as to whether— A. Yes.

"Q. —to risk damaging the cable as against saving your ship? A. Yes.

"Q. So it was your responsibility to let the anchor go? A. That's right. It was just one of those things."

The mate of the Liberator also testified he dropped the anchor under Captain Caldwell's orders.

██ It is true portions of the master's deposition suggest that the anchoring was a joint decision—his and the tug pilot's—but upon the whole record I am satisfied it was the master who gave the order and assumed full responsibility for its execution. Nonetheless the libellant seeks to avoid liability for the master's conduct. It contends that the respondents' pilot displaced the master of the Liberator; that the command and navigation of the entire flotilla including members of the Liberator's crew was transferred to the tug pilot and hence respondents are liable for the alleged negligent conduct. But the facts do not support the claim and the applicable law is to the contrary. The fact that a pilot was on board the vessel did not absolve Caldwell, the master, from his duties. He still remained in command of his vessel and retained authority to control the actions of the pilot to assure the safety of his ship or the avoidance of imminent danger.[1] The master not only retained the power but had the duty to interfere in all cases of necessity or danger and to displace the pilot.[2] The exercise of this power rested within the master's sound discretion and is determined by the factual situation.[3]

Here, as shown by Captain Caldwell's statement, he not only exercised his power but acknowledged he did so upon his own responsibility.[4] It should also be pointed out this was not an instance of a compulsory or statutory pilotage, or one where the pilot was hired to bring a ship to safe anchorage because of his superior or special knowledge of local waters;[5] further that the Liberator was "dead" and the tugs and the tug pilot were hired essentially to do a towing job and not a piloting job. In any event, whether the pilot was a voluntary or compulsory one, the master did not surrender his authority.[6] The master, with seven years experience in the New York harbor area, was fully conversant with local conditions.

The change in weather was swift. Just as the flotilla reached Governors Island approaching the East River the wind suddenly increased in velocity and the Captain stated "we knew we had to do something in a hurry, and dropped the anchor. It was almost instantaneously." His stated purpose was "to back up the anchor and go over to the Statue of Liberty and anchor there, waiting for the other tugs to turn up;" he further admitted that if it had occurred to him there were not sufficient tugs to make the passage in safety between Governors Island and the Battery he could have anchored before reaching the cable area.

Upon all the facts the situation here presented is distinguishable from such cases as Ralli v. Troop, 157 U.S. 386, 402, 15 S.Ct. 657, 39 L.Ed. 742; Union Shipping & Trading Co. v. United States, 2 Cir., 127 F.2d 771, 775, and others relied upon by libellant.

██ Next, libellant seeks to fasten liability upon the respondents for the alleged inadequacy of the three tugs both as to number and horsepower. No testimony of probative value was offered to support the claim. No expert was called to testify that a greater number of tugs, or those of greater horsepower, would

1. The Oregon, 158 U.S. 186, 194, 15 S.Ct. 804, 39 L.Ed. 943; Ralli v. Troop, 157 U.S. 386, 402, 15 S.Ct. 657, 39 L.Ed. 742; The Manchioneal, 2 Cir., 243 F. 801, 806.

2. The China, 7 Wall. 53, 67, 74 U.S. 53, 67, 19 L.Ed. 67.

3. Dampskibsselskabet Atalanta A/S v. United States, 5 Cir., 31 F.2d 961, 962.

4. Even if it were found that the pilot gave the order to let the anchor go, this would not change the result since it is beyond question the master fully concurred in and approved the order. The Manchioneal, 2 Cir., 243 F. 801, 806.

5. Cf. Union Shipping & Trading Co. v. United States, 2 Cir., 127 F.2d 771; Ralli v. Troop, 157 U.S. 386, 401–402, 15 S.Ct. 657, 39 L.Ed. 742; Homer Ramsdell Transp. Co. v. Compagnie Generale Transatlantique, C.C., 63 F. 845, affirmed 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155.

6. Robins Dry Dock & Repair Co. v. Navigazione Libera Triestina, S.A., 2 Cir., 32 F.2d 209.

have brought the vessel into the wind and avoided the alleged imminent danger of drifting into the rocks off Governors Island which led to the dropping of her anchor. The circumstance that after the anchor was dropped two additional tugs arrived and another pilot came on board to assist the Liberator in freeing herself from the cable does not supply this deficiency in the proof.

There is some suggestion that Captain Caldwell had been advised by the tug pilot that a fourth tug would meet the flotilla at the mouth of the East River and he proceeded to the Governors Island area upon that assurance. In the first place, the testimony on this subject is quite equivocal, but more important, Caldwell clearly indicated that a fourth tug would not have relieved the situation. "Q. Did you feel that if the other tug had arrived as scheduled, that it would not have been necessary to drop the anchor? A. Oh, no, no, I wouldn't say that."

The libellant further urges that the tug pilot was chargeable with knowledge of storm warnings, whether he knew of them or not.[7] At 6:00 a. m. of the date of the accident the Weather Bureau had posted storm warnings "for winds shifting to the northwest 40 to 50 miles per hour today and continuing tonight," and libellant argues the shift in wind and tide conditions could have been reasonably anticipated, in which event it is further contended that the three tugs were inadequate. When the flotilla left dry dock at about 4:30 p. m. the wind movement was 32 miles per hour, maximum velocity 41 miles per hour. When it reached the Governors Island area at about 7:00 p. m. the wind direction was northwesterly, wind movement 39 miles per hour, maximum velocity 50 miles per hour. As we have seen, the master was fully satisfied the three tugs were sufficient to maneuver and shift the vessel under the prevailing weather conditions upon departure from dry dock, but neither he nor the pilot appeared to have acquired notice of the storm warnings. But in and of itself this failure is not sufficient to establish negligence on the part of the pilot. "It is true that masters are chargeable with notice of such warnings * * * and are prima facie negligent if they do not see them. But the fact of a warning is not enough, without more, to constitute negligence."[8] But even were it accepted as the tug pilot's sole responsibility and not the master's to observe the storm warnings, there is upon the record no basis for holding that this failure was the proximate cause of the damage.

The respondents are entitled to a decree dismissing the libel.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Either party may within five days propose upon notice to the other side enumerated or additional Findings.

---

7. Nicholson v. Erie R. Co., 2 Cir., 255 F. 54.

8. Bouchard Transp. Co. v. Pennsylvania R. Co., 2 Cir., 6 F.2d 362, 363.