HEWITT v. SPEYER et al.

(Circuit Court of Appeals, Second Circuit. March 7, 1918.)

No. 187.

INTERNATIONAL LAW ⊜⟹8—ACTS OF SOVEREIGNTY—REVIEW BY COURTS OF ANOTHER COUNTRY.

Courts of the United States will not adjudicate upon the validity of the acts of a foreign nation, performed in its sovereign capacity within its own territory, nor will persons involved with such government in the performance of such acts be subjected to a civil liability therefor.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by Erskine Hewitt against James Speyer, Henry Ruhlender, Richard Schuster, and Eduard Beit Von Speyer, individually and as copartners composing the firm of Speyer & Co., and the United States Mortgage & Trust Company, as trustee under the mortgage of the Guayaquil & Quito Railway Company. Decree for defendants, and complainant appeals. Affirmed.

For opinion below, see 248 Fed. 590.

This cause comes here on appeal from a decree entered on October 19, 1917. The action is one in equity to impress a lien on a fund paid to the defendants by the republic of Ecuador out of the customs duties collected by that republic upon which a prior lien had been created in favor of the holders of certain bonds, some $50,000 of which are held by the complainant; and it is alleged that the fund so received by the defendants substantially amounts to $1,500,-000, and that they received it with full knowledge of the prior lien. The complainant sues on his own behalf and that of all other bondholders of the Guayaquil & Quito Railroad Company, under a mortgage dated January 2, 1899, who may join in the prosecution of the action.

It appears that a contract was entered into on June 14, 1897, between the government of Ecuador and one Archer Harman for the construction of a railroad, from Guayaquil, its principal seaport, to Quito, its capital, a distance of 286 miles. The total cost of the work was estimated at $17,532,000, which sum was to be raised by the issue of $12,282,000 6 per cent. bonds and $5,250,000 7 per cent. preferred stock of the company, which was to be organized under the laws of the United States to finance the undertaking and construct and operate the railroad for a period of 75 years, when it was to become the absolute property of the government. In addition to the bonds and the preferred stock, there was to be issued $7,032,000 common stock, of which 49 per cent. was to be held by the government of Ecuador and 51 per cent. by Archer Harman and his associates.

The bonds were issued as contemplated, and a mortgage to secure their payment was executed and recorded; the mortgage being upon the railway property and its appurtenances. On each bond was printed in English the following:

"The republic of Ecuador * * * guarantees with its entire custom house receipts, subject only to the prior liens thereon, more specifically set

forth in condition 9 of this bond, the payment of the principal of the within bond and of the interest thereon at the rate of 6% per annum, and of 1% per annum for sinking fund, and subject to the liens aforesaid the republic of Ecuador pledges to the United States Mortgage & Trust company, as trustee, all its said custom house receipts as security for the equal payment of the principal and interest on this bond and all other bonds of this series, and also of the aforesaid sinking fund, and further agrees that the collector of the customs in Guayaquil shall deposit directly, every 15 days during the entire period of 33 years for which this bond is to run, unless sooner redeemed, the proper portion of interest and sinking fund due thereon in the Banco Comercial y Agricola in Guayaquil, which said bank shall remit said sum to the depository bank in London for the payment of the semiannual coupons and sinking fund.                                              Tomas Gagliardo,

"Ministro de Hacienda de la Republica del Ecuador."

Condition 9 of the bond referred to in the foregoing statement provided that "the lien on the custom house duties, which duties are stated by the government of Ecuador to amount to six million sucres (6,000,000) annually, is subject to following liens for the following sums payable monthly; that is to say." Then follows a list of the prior liens covering existing indebtedness, aggregating 104,637.74 sucres.

In December, 1910, Ecuador needed money for administrative and extraordinary military expenses, and it obtained from the defendant Speyer & Co. 2,550,000 sucres, or $1,238,662.50. The contract, dated December 31, 1910, provided that the government of Ecuador should issue treasury certificates to the face amount of 3,000,000 sucres, for which Speyer & Co. agreed to pay 85 per cent. of their par value. These certificates were payable to bearer, and bore interest at 6 per cent. per annum, and were payable in 12 months. For the payment of principal and interest the government pledged and specially designated: (a) 50 per cent. of the entire amount of export duties, including recharges, from June 1, 1911 (or before that time on a certain contingency), and 500,000 sucres of that part of the liquor tax belonging to the treasury. (b) And all custom house revenues immediately subject to the "gravamenes" [1] which they bear up to the present time. It was provided that the certificates were to be received at par for principal and interest in the custom houses of Ecuador in payment of the export duties (50 per cent. of the export duties, including all recharges) from June 1, 1911, and the custom house collectors were forbidden to take money in payment of such duties. Speyer & Co. were to designate the bank or agents to sell the certificates.

The treasury certificates were not actually sold to exporters, as contemplated in the contract, but were, at the request of the government of Ecuador, deposited to the credit of Speyer & Co. with the Bank of Ecuador, where, by order of the government, the moneys from the export duties and from the liquor tax designated to retire the certificates were also from time to time, as they were collected, deposited to the credit of Speyer & Co., and thereupon to the extent of such credits the certificates were surrendered to the government and by it canceled and burned. The Speyer certificates were paid in full; Speyer & Co. receiving in payment the sum of $1,559,485.59. All the coupons on the railway bonds falling due up to and including July 2, 1912, have been paid, but those falling due on the first mortgage bonds since then remain unpaid.

The complainant insists that the contracts and the mortgage upon which his rights rest constitute a special law of Ecuador, and that such a law takes precedence over the Civil Code, and creates a definite lien or charge upon the customs revenues, which is enforceable against third parties, who take with notice of the existence of such a lien, and that Speyer & Co. had such notice. The defendant Speyer & Co. assert that no lien upon the customs revenues was created in favor of the bondholders or their trustee. The theory of the bondholders is that the custom house revenues, including export as well

---

[1] The Spanish word used in the original is "gravamenes," which respondents claim means in English "charges," and the appellant asserts means "liens."

as import duties, were specially assigned to them prior to the Speyer contract, and in answer to their protest Speyer & Co. agreed that they would deposit and hold in a separate account any moneys received by them from customs duties, and would not withdraw these moneys without 30 days' notice in writing. This notice was given on October 15, 1915.

Thereupon complainant began this suit, and obtained an ex parte order to show cause why Speyer & Co. should not be restrained from distributing the moneys pending the suit, with a temporary stay. A final decree has been entered in the District Court, dismissing the bill of complaint upon the merits, and vacating the injunction pendente lite obtained ex parte by complainant.

Masten & Nichols, of New York City (E. Henry Lacombe, Arthur H. Masten, and H. Barstow Farr, all of New York City, of counsel), for appellant.

Cadwalader, Wickersham & Taft, of New York City (Henry W. Taft and George Coggill, both of New York City, of counsel), for respondent Speyer & Co.

Patterson, Eagle, Greenough & Day, of New York City (C. D. Francis, of New York City, of counsel), for respondent United States Mortgage & Trust Co.

Before ROGERS and HOUGH, Circuit Judges, and LEARNED HAND, District Judge.

ROGERS, Circuit Judge (after stating the facts as above). The contention of the complainant is: That the republic of Ecuador intended that the customs revenues should be an effective security for the railway bonds some of which the complainant holds; that these revenues were constituted such security by a special law of Ecuador which must be so construed as to make the security effective: that the technical rules of the Civil Code of that country regarding mortgage, pledge, or guaranty are inapplicable, having been superseded by the special law: that the customs revenues, thus impressed with a charge in complainant's favor, have been traced into the hands of the defendant Speyer & Co., who took with full knowledge of the bondholders' claim thereto; and that under the circumstances the complainant is entitled to an equitable lien on the fund under well-settled principles of equity. He further contends that he is entitled to enforce in this court the lien he claims, irrespective of whether or not there was a valid charge or lien recognized under the law of Ecuador, for the reason that, the parties having agreed that the customs revenues should be a security for the bonds, this court, having jurisdiction of the parties and the fund, can enforce such agreement. In other words, the gravamen of the claim which the complainant asserts is that Ecuador violated his rights under the law of that country by performing its contract with the defendant Speyer & Co., by repaying the loan out of the customs revenues, instead of discharging its obligation to the bondholders on its guaranty of the bonds, which it is asserted had been given a prior lien on such revenues. The cause of action is thus based upon a claim that moneys which should have been paid to the bondholders have been wrongfully paid by the government of Ecuador to the defendant Speyer & Co.

It cannot be denied that the moneys which complainant seeks to reach the defendant Speyer & Co. received under a contract executed in Ecuador, on behalf of its government, and that money so paid was collected in Ecuador by its government from export duties and liquor taxes, and was paid over by its officials by depositing the same in the Banco del Ecuador to the credit of Speyer & Co. So that the question which this court has to pass upon is whether it is within its jurisdiction to determine whether the government of Ecuador paid to Speyer & Co. money which it had set aside as a security for the payment of the holders of the first mortgage bonds of the Guayaquil & Quito Railway Company, or in respect to which it had created a lien in their favor. If it is within the court's jurisdiction to consider this question, then it will be necessary to pass upon a number of other questions necessarily involved; but, if the jurisdiction does not exist, we need not inquire further.

From what has been stated, it is evident that the title of Speyer & Co. to the money herein involved is derived from the government of Ecuador and that the court cannot grant the relief invoked without sitting in judgment upon the sovereign acts of that nation. This very clearly it is not within the province of the court to do. In Underhill v. Hernandez, 65 Fed. 577, 13 C. C. A. 51, 38 L. R. A. 405, decided in 1895, this court said that:

"Considerations of comity, and of the highest expediency, require that the conduct of states, whether in transactions with other states or with individuals, their own citizens or foreign citizens, should not be called in question by the legal tribunals of another jurisdiction. * * * It would be not only offensive and unnecessary, but it would imperil * * * governments, and vex the peace of nations, to permit the sovereign acts or political transactions of states to be subjected to the examination of the legal tribunals of other states."

And this the Supreme Court affirmed in 168 U. S. 250, 18 Sup. Ct. 83, 42 L. Ed. 456, where Chief Justice Fuller, writing for the court, said:

"Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves."

These cases show that the plaintiffs' claim cannot be adjudicated in an American court, because to do so would make it necessary to pass on the right of the government of Ecuador to do what was done. And see American Banana Co. v. United Fruit Co. (C. C.) 160 Fed. 184, which was affirmed by this court in 166 Fed. 261, 92 C. C. A. 325, and by the Supreme Court in 213 U. S. 347, 29 Sup. Ct. 511, 53 L. Ed. 826, 16 Ann. Cas. 1047.

The law in England is to the same effect. In Webb's Pollock on Torts, p. 137, Sir Frederick Pollock states the rule as follows:

"If we may generalize from the doctrine of our own courts, the result seems to be that an act done by the authority, previous or subsequent, of the government of a sovereign state in the exercise of de facto sovereignty, is not examinable at all in the courts of justice of any other state. So far forth as it

affects persons not subject to the government, it is not examinable in the ordinary courts of that state itself. If and so far as it affects the same state it may be, and in England it is, examinable by the courts in their ordinary jurisdiction."

The law thus stated is fully supported by the English decisions. Duke of Brunswick v. King of Hanover, 2 H. L. Cases, 1; Secretary of State v. Kamachee, 13 Moore, Privy Council, 22; Buron v. Denman, 2 Exc. 167; Dose v. Secretary of State, L. R. 19 Eq. 509. We take the principle to be incontrovertible in both countries that our courts, not only will not adjudicate upon the validity of the acts of a foreign nation performed in its sovereign capacity, but also that persons involved with such government in the performance of such acts cannot be subjected to a civil liability therefor.

It is true the complainant asserts that his right to recover against the defendants may be sustained without any adjudication as to the legality of the acts of Ecuador; and in complainants' brief it is said that "it is not complainants who are attacking the validity of any government acts of Ecuador." The justification for this statement the complainant no doubt finds in his admission that the government of Ecuador did appellant no wrong in entering into the contract with the defendant Speyer & Co., because that contract was made subject to the prior rights of the bondholders, and not in disregard of them, and "in this form there is nothing unlawful per se in the Speyer contract." The statement that complainant is not assailing the legality or propriety of the acts of the government of Ecuador does not in all respects accord with the facts; for it is evident that the legality of the use by the government of the customs-duties is necessarily involved in any decision that Speyer & Co. did not have the right to receive the money, for if it was wrong for Speyer & Co. to receive it as against the complainant and the other bondholders, it was wrong for the government to pay it. There can be no escape from the proposition that either the government of Ecuador wrongfully diverted from the bondholders the moneys paid to Speyer & Co., in which event the courts of the United States must disclaim any jurisdiction to adjudicate upon the matter, or such diversion of the revenues was lawful, in which event the complainant is without a cause of action.

The United States Mortgage & Trust Company is a party defendant, and, it is alleged, was requested to bring an action to enforce the bondholders' rights to the funds in suit and to prevent a distribution thereof, and refused to do so. This allegation it denies, and it declares that no request signed and executed in the manner provided for in the mortgage was ever presented. However that may be, it is very evident that the objection found fatal to the maintenance of the complainant's suit as against Speyer & Co. is equally fatal as against the United States Mortgage & Trust Company, as trustee.

In arriving at the conclusion we have reached, that the courts of this country are unable to adjudicate upon the complainant's claim, it is hardly necessary to say that this does not leave the complainant remediless, if his rights have in fact been violated. If the government of Ecuador has violated his rights, it is within the province of another

department of the government of the United States to bring the matter, if it deems justice so requires, to the attention of the government of Ecuador.

Judgment affirmed.