DORRANCE et al. v. BARBER & CO., Inc.

(Circuit Court of Appeals, Second Circuit. December 10, 1919.)

No. 65.

1. SHIPPING ⟝108—MEANING ATTACHED TO WORDS IN CONTRACT OF CARRIAGE AT TIME THEY WERE WRITTEN CONTROLLING; "MERCANTILE CONTRACT."

A contract between a shipper and carrier for the carriage of a stated quantity of cotton on one of the carrier's ships *held* a "mercantile contract," to be construed in accordance with the meaning attached to the words at the time they were written.

2. SHIPPING ⟝108—WORDS "JANUARY SHIPMENT FROM GALVESTON" A WARRANTY.

In a contract for carriage by respondent from New York on one of its ships of a quantity of cotton, "January shipment from Galveston," the words quoted *held* to be a warranty, and respondent *held* not required to accept cotton not shipped in January from Galveston.

3. CONTRACTS ⟝294—"SUBSTANTIAL PERFORMANCE."

"Substantial performance" means not doing the exact thing promised, but doing something else that is just as good, or good enough for both obligor and obligee.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Substantial Performance.]

Appeal from the District Court of the United States for the Southern District of New York.

Suit by John M. Dorrance and others, trading as Dorrance & Co., against Barber & Co., Incorporated. Decree for respondent, and libelants appeal. Affirmed.

Respondent corporation owns and operates a line of freight steamers. A contract was made by it with libelant, expressed in a broker's note, of which the following is the material portion:

"Engaged for account of Messrs. Dorrance & Co. (shipper).

"Destination—Vladivostock; Steamer—Barber Line. With Barber & Co., Agents. 1,000 bales compressed cotton at $2.25 net per 100 lbs. freight prepaid. January shipment from Galveston."

This agreement was made January 5, 1916, and it is admitted that the last phrase quoted from the broker's note means that the cotton to be carried by the Barber Line was to be shipped from Galveston, Tex., in the month of January.

The reason for the clause as proved is that it enabled the carrier to book freight coming from Galveston with a reasonable expectation of its delivery in New York in not over two weeks from shipment in Galveston, so that this consignment could reasonably be expected to get out of New York during the first half of February.

It is further admitted that respondent was not bound to carry by any particular vessel. On February 9th it did "declare" the "Bolton Castle"; i. e., notified libelants to deliver their cotton. Accordingly on February 12th Dorrance sent a lighter with approximately the contract quantity of cotton on board to Barber's pier, and the lighterman delivered to respondent's agent the usual papers evidencing title and right to ship, but Barber & Co. never physically received or receipted for the cotton; that, according to custom as proved, would have occurred when the goods were either on board or on respondent's pier. Meanwhile the Bolton Castle was loading other cargo, of a kind that would naturally be stowed below the cotton, and the cotton-laden lighter lay near by. On February 16th a fire broke out which greatly injured respondent's pier and the steamship, but completely destroyed the cotton on the lighter.

The Bolton Castle required repairs, which prevented her use for about three months; at the expiration of that time she started for Vladivostock. On or about February 20th Dorrance tendered to Barber other cotton in attempted fulfillment of the contract stated, but it was not "January shipment from Galveston"; cotton so shipped being impossible to obtain. Thereupon Barber refused to receive the same, on the sole ground that it had not been shipped as per contract. Dorrance, who had sold that quantity of cotton to arrive in Siberia, thereupon shipped at a much higher rate by other carriers, and brought this suit to recover as damages for breach of contract the excess paid. The District Court dismissed the libel.

Harrington, Bigham & Englar, of New York City (Oscar R. Houston, of New York City, and Geo. S. Brengle, of San Juan, P. R., of counsel), for appellants.

Hunt, Hill & Betts, of New York City (Geo. Whitefield Betts, Jr., and Robert McLeod Jackson, both of New York City, of counsel), for appellee.

Before WARD, ROGERS and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] The agreement herein involved is accurately described as a contract for freight, if not strictly a contract of affreightment, and for present purposes there is no difference between the phrases. The contest before us is shortly, but sufficiently, stated by inquiring whether such a contract is a "mercantile contract," as those words have been used in a long line of decisions of controlling authority.

Charter parties are mercantile contracts (Lowber v. Bangs, 2 Wall. 728, 17 L. Ed. 768), and so are contracts for the sale of chattels (Norrington v. Wright, 115 U. S. 188, 6 Sup. Ct. 12, 29 L. Ed. 366). If Dorrance, instead of hiring room in a large ship for 1,000 bales of cotton, had chartered a small one to carry the same, the transaction would have been absolutely governed by the cases cited. We perceive no difference in principle between hiring a whole ship for the carriage of freight, and engaging room for a little freight in the same ship; both acts are the natural fruit of the same activities, normally pursued by men of the same environment and education, for the same purposes. Every reason assigned by Swayne, J., in the Lowber Case for putting charters in the class of mercantile contracts, and construing such contracts in the manner there authoritatively done, applies with equal force here, and we unhesitatingly hold this a mercantile contract.

Such contracts are to be construed according to the intention of the parties, but that intention, when it comes to labeling or defining any particular stipulation as a warranty, or a condition precedent, or a representation, or an independent covenant, must be discovered from the instrument itself. This rule may at times involve plain men using hard words in some difficulty, but it insures that plain men using plain words will have their language enforced according to the meaning attaching to the words at the time they were written. The construction is to be irrespective of after-occurring events (Davison v. Von Lingen, 113 U. S. 40, 5 Sup. Ct. 346, 28 L. Ed. 885), and if the parties by plain words make that fundamentally important, which courts and juries subsequently deem immaterial and would like to disregard, it is not for them to substitute the wisdom of their hindsight for what they may regard as the folly of the parties (National Surety Co. v. Long, 125 Fed. 887, 60 C. C. A. 623, and cases cited).

[2] It is not denied nor doubted that, when these parties wrote "January shipment from Galveston," they meant that what Barber was to carry was cotton that had started on its journey in January. It is shown by evidence that the reason for this stipulation was to enable Barber to rely on arrivals in New York. We think the fact immaterial, if the phrase is both comprehensible without explanatory evidence, and to be regarded as a condition precedent or a warranty.

That it is such condition or warranty we feel assured, because it may be regarded either as a stipulation in respect of time which is of the essence in contracts mercantile (Connell, etc., Co. v. Diederichsen & Co., 213 Fed. 737, 130 C. C. A. 251, and cases cited), or as a descriptive statement intended to be a substantive part of the contract, which is a warranty (Behn v. Burness, 3 B. & S. 751). The truth of this last interpretation is tested by asking whether, if no fire had occurred (the normal expectation), Dorrance would have dared to tender to Barber cotton that did not leave Galveston in January? That he would not is, we think, admitted, and is obvious at all events.

Argument for appellant, as to construction of contract, really disregards the rule of Davison v. Von Lingen, supra, and relies on after-occurring accidents to control construction. The Bolton Castle did not and could not sail as contemplated, and long before her delayed de-

parture other cotton was tendered; and, to quote from a witness, "cotton is. cotton," and this new tender would weigh as much and pay as much as if it had come from Galveston in January, instead of from some other equally celebrated cotton center. The judgment, and especially the words of Lord Blackburn in Bowes v. Shand, 2 App. Cas. 455, disposes of a similar argument, if rice be substituted for cotton.

The sum of the matter is that libelant warranted to respondent cotton of a particular description, that the description is in terms of time is accidental, and when (though without fault on his part) Dorrance failed to deliver the warranted article, he failed to fulfill the contract he had made.

The doctrines of substantial performance and waiver have no application to this case. Waiver is always a voluntary act or the necessary legal result thereof, and is mainly a question of intention. Frankfurt-Barnett Co. v. Prym, Co., 237 Fed. 21, 150 C. C. A. 223, L. R. A. 1918A, 602, and cases cited. Nothing but the fire is suggested as evidencing a waiver by Barber, and that certainly was neither intentional nor voluntary.

[3] Substantial performance, as that phrase is correctly used, means not doing the exact thing promised, but doing something else that is just as good, or good enough for both obligor and obligee; and courts and juries say what is good enough or just as good. The object (or one important purpose) of warranties and precedent conditions is to prevent (e. g.) our doing any such thing in this case.

Decree affirmed, with costs.