## THE CLAVERESK.

### EARN LINE S. S. CO., Limited, v. SUTHERLAND S. S. CO., Limited.

(Circuit Court of Appeals, Second Circuit. February 18, 1920.)

No. 114.

1. **Amicus curiæ** ⬅I—**Term defined.**

An "amicus curiæ" is one who gives information to the court on some matter of law in respect to which the court is doubtful.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Amicus Curiæ.]

2. **Amicus curiæ** ⬅I—**Parties not entitled to object.**

An application for the privilege of appearing as amicus curiæ is of no personal concern to the parties, and the court may grant or refuse the request, according as it deems the proffered information timely and useful, or otherwise.

3. **Amicus curiæ** ⬅I—**Information, if of evidential value, to be tested by legal rules.**

If the information given the court by an amicus curiæ is of evidential value, it must, like other evidence, be weighed and tested by legal rules.

4. **Appeal and error** ⬅969—**Receiving suggestion of amicus curiæ not reviewable.**

Whether the trial judge should or should not have received and considered a suggestion filed by the British ambassador as amicus curiæ is not reviewable.

5. **Shipping** ⬅41—**Effect of charter, which is not a demise, stated.**

Where a time charter of a steamship is not a demise, the master, subject to the charterer's chartered rights, is the owner's master, and the ship, through him, is in the owner's possession.

6. **Shipping** ⬅51—**Requisition by government is within clause as to "restraint of princes."**

The "restraint of princes" clause of a time charter of a steamship is not limited to physical restraint of the ship itself, but includes restraint exercised on the owner by a governmental requisition of the ship.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Restraints of Kings or Princes.]

7. **Shipping** ⬅51—**Restraint of rulers must be governmental.**

The fundamental essential of a restraint of rulers, within a time charter of a steamship, is that the restraining act should be governmental.

8. **Shipping** ⬅51—**Restraint by government need not be resisted.**

The owner of a steamship covered by a charter containing the usual restraint of princes clause was not required to attempt to resist or evade a requisition of the ship by its government, in order to rely on such clause.

9. **Shipping** ⬅51 — **Requisition of ship constituted lawful restraint within charter.**

Where the requisition by the British government of a ship under a charter containing the usual restraint of princes clause was a governmental act, done within British territory, it was a lawful act, within such clause of the charter, whether or not the municipal and constitutional law of that country was strictly followed.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**10. Shipping ⊜⇒38—Requisition by government held to terminate charter.**

Though restraint of princes provided for by the usual clause of a charter does not ordinarily terminate the charter nor dissolve the contract, the requisition of a British steamship by the British government in January or February, 1917, frustrated the adventure and terminated the charter, where there was no reasonable expectation that the steamship would be released by the government for any use contemplated by the charter during its term.

**11. Shipping ⊜⇒39—Language of different "mercantile contracts" to be given same construction.**

A charter party, a bill of lading, a freight contract, and most written agreements affecting ships as vehicles of commerce are "mercantile contracts," and the same words in all of them should receive the same construction.

**12. Contracts ⊜⇒309(2)—Dissolved by cessation of existence of thing on which it depends.**

A contract is ended and dissolved by the cessation of existence of some thing, condition, or state of things upon the continued existence of which the contract was known to depend, provided such cessation of existence arises without fault of either party.

**13. Admiralty ⊜⇒63—Replication not entitled to filing, unless allowed.**

In a suit in admiralty, a replication is not entitled to be filed, when not allowed under admiralty rule 51 (29 Sup. Ct. xliv).

**14. Admiralty ⊜⇒63—Replication denying matter in answer unnecessary.**

A replication in admiralty, so far as it denies matter in the answer, is unnecessary.

**15. Shipping ⊜⇒58(2)—Replication improper, as setting up inconsistent cause of action.**

Where the libel sought damages for breach of a charter covering a steamship, which was requisitioned during the life of the charter by the British government, a replication seeking to recover the difference between the charter hire and the amount paid by the government was not a proper replication, as it set up a new cause of action wholly inconsistent with that propounded in the libel.

**16. Shipping ⊜⇒58(1)—Profits under governmental requisition not recoverable by charterer under libel for damages.**

If, in any case, a charterer of a steamship requisitioned by the government before expiration of the term of the charter may recover from the owner the difference between the charter hire and the amount paid by the government, it cannot do so under a libel seeking damages for breach of the charter, as profits are not damages.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the Earn Line Steamship Company, Limited, against the steamship Claveresk, her engines, etc., claimed by the Sutherland Steamship Company, Limited, with others impleaded. From a decree dismissing the libel (254 Fed. 126), the libelant appeals. Affirmed.

Libelant, a corporation of Pennsylvania, filed this libel in rem against the steamship Claveresk, and in personam against her owner—this respondent and a British corporation. No seizure of the vessel ever occurred, and the action remains in personam only, in "a cause of contract civil and maritime," viz. for breach of the charter party hereinafter described.

In 1913 respondent (hereafter called Sutherland) executed to libelant (hereafter called Earn Line) a charter of its steamship Claveresk for "about five years"; i. e., until say April, 1918. The hiring was in the ordinary "government form" of time charter, which is not a demise; the use of the vessel was restricted to a part of the Atlantic and to Mediterranean waters. Earn Line

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

could sublet, and the usual "break down" and "restraint of princes" clauses were embodied in the document.

On January 25, 1917, the Claveresk under this charter was on a voyage from Baltimore to Cuba, when Sutherland, at its home office in Newcastle, England, received a telegram from a division or bureau of the Admiralty, known as "Transports," stating that Claveresk was "required for government service after completion discharge in West Indies; formal requisition follows." Two days later Sutherland received a "formal requisitioning letter with the signature of the Secretary of the Admiralty."

Sutherland owned upwards of 20 steamers other than Claveresk; in January, 1917, all had been requisitioned except 3, and they were "running in special trades subject to approval of the government." Requisition was not objected to, and neither then nor down to trial (October 23, 1918) was effort made to obtain release of Claveresk. On February 1, 1917, the steamer was in a Cuban port, and the master was instructed by Sutherland to put himself under the orders of agents named by the Admiralty.

On February 10, 1917, her inward cargo having been discharged, Claveresk passed under control of the British Admiralty, which tendered Sutherland a formal charter at a rate much higher than that of Earn Line's contract, but much below the market. We find it proven that, following the general custom of owners of requisitioned bottoms, Sutherland declined to sign the Admiralty charter, but expected to get and did receive the rate of hire therein named. When Claveresk thus passed under control of British Admiralty, she seems to have been subchartered by Earn Line to Munson; and on the day for payment of charter hire next following February 10th, Earn Line tendered in writing to Sutherland's agents in New York the amount due under the original charter of 1913, and added: "Claveresk-Munson: We presume you will be collecting half month's hire to-day from Munson Line, and remit us in the usual way."

We infer from this that these agents (the house of Winchester & Co.) were acting for Earn Line in respect of the subcharter. Winchester replied, declining payment, adding: "The owners [of Claveresk] consider that the requisition of the steamer by the Admiralty has completely frustrated the adventure covered by the charter party."

From this we deduce the finding that, as of February 10, 1917, Sutherland took and stood on the position that its charter with Earn Line was then lawfully terminated, and that all rights or demands growing therefrom, including subcharters, ceased and determined; while Earn Line held, and in legal effect asserted, that the Admiralty requisition did not terminate the contractual relation either between Sutherland and itself, or itself and the subcharterer.

This exchange of views occurred February 16–17, 1917, but on February 10, 1917, this libel was filed, wherein the subtraction of the steamer from Earn Line's service was treated as a refusal by Sutherland to perform the charter party, and a repudiation thereof. Damages for the breach are claimed in usual form; i. e., the charter hire was £1,320 per month, the market rate at date of libel filed £18,500 per month, the charter party had still 14 months to run, wherefore libelant asserted its damages to be more than $1,250,000.

The answer substantially pleaded the requisition (1) as a restraint of princes; (2) as a frustration of the commercial adventure between the parties.

At trial the British ambassador obtained leave as amicus curiæ to file a suggestion, accompanied by a certificate that the Claveresk had been requisitioned on February 10, 1917, had been retained in government service down to date of certificate (a few days before hearing), and that such requisition and retention was a governmental act on the part of the "government of said United Kingdom." The suggestion was that the court should "decline to adjudicate" the claim in suit, "in so far as such (claim) arises out of the requisition of said steamship by the British government."

At trial respondent rested on the ambassador's certificate, or the legal effect of the facts therein set forth. Libelant showed the further facts hereinabove recited, and filed what is called a "replication"—in form a pleading wherein Earn Line (1) "denies that respondent was under any legal compulsion to withdraw the Claveresk," and asserts the vessel to have been "voluntarily with-

drawn and relet" at a higher rate; and (2) alleges (in the event of legal compulsion on respondent being shown) that it as charterer is entitled to, and "respondent is bound to pay," all excess over the charter hire of 1913 which Sutherland in fact received from the Admiralty during so much of the period of requisition as coincided with the chartered period. This "replication" was filed over the respondent's "protest." In an opinion reported 254 Fed. 127, L. Hand, J., dismissed the libel; this appeal followed.

We here insert as findings of fact by us on this new trial: (1) Sutherland did not voluntarily—i. e., did not seek to—withdraw Claveresk from libelant's service, nor ask nor induce government to requisition; (2) in January—February, 1917, having regard to the then violence of German submarine warfare on merchant vessels, and the success thereof, no reasonable man would have expected or even dared hope that the Claveresk, once taken into government service, would be released for any use contemplated by the charter of 1913, before the expiry of the term of that charter.

In this court, on motion duly made before argument, the British ambassador was again permitted to appear as amicus curiæ.

Howard Thayer Kingsbury and Frederic R. Coudert, both of New York City, for the ambassador.

Haight, Sanford, Smith & Griffin, of New York City (Charles S. Haight and Wharton Poor, both of New York City, of counsel), for appellant.

Kirlin, Woolsey & Hickox, of New York City (John M. Woolsey, of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1, 2] The phrase amicus curiæ means one who gives information to the court on some matter of law in respect of which the court is doubtful (Bouv. Dict., and cases cited); and it is assigned for error that the court below permitted its friend to speak. Such seeking of advice cannot with propriety be called error; the act is the right of the court, existing because it is for the public interest that the men who happen to be judges shall be well informed in matters of public concern, and the law is always such a matter. That application was made for the privilege of so appearing is of no personal concern to the parties, and the court may grant or refuse the request, according as it deems the proffered information timely and useful or otherwise (e. g., vide The Employers' Liability Cases, 207 U. S. 490, 28 Sup. Ct. 141, 52 L. Ed. 297).

[3] What effect the court gives to the information so received is a different matter. The friend's statements, if of evidential value, must, like other evidence, be weighed and tested by legal rule. In this instance the substance of the suggestion offered was that the British embassy avowed as a governmental act on the part of the United Kingdom the requisitioning of the Claveresk on or about February 10, 1917, and its continuous retention in government service substantially down to the day of trial.

[4] The question whether the trial judge should or should not have received and considered this suggestion is not reviewable; but it may be and has been assigned for error that the court below held the suggestion conclusive evidence of two essential facts, viz.: (1) The

compulsory nature of the Claveresk's service; and (2) the identification of government as the compelling force. While this court feels no inclination to depart from the rulings of The Carlo Poma, 259 Fed. 396, and Agency, etc., Co. v. American, etc., Co., 258 Fed. 368, 169 C. C. A. 379, holding that a certificate such as this, describing a certain act and avowing it as governmental, is to be taken as verity, we do not find it necessary to rest decision on this ground. The evidence in the ordinary sense of that word—i. e., the competent and material testimony of persons duly sworn and papers produced—is sufficient for our purposes; indeed, we think this was the course pursued below.

That evidence shows that within the kingdom of England an order was given by the British Admiralty to the owner, requiring him on a day certain to place his vessel, then within (or soon to reach) the waters of the republic of Cuba, at the service of Admiralty agents, there to remain for an indefinite period. Thus the question is reached whether in obeying the order, Sutherland yielded to that restraint of princes excepted in the charter party.

[5] It is here to be noted that the charter was not a demise. Subject to the chartered rights of Earn Line, the shipmaster was the owner's master, and the ship, through that master, in the owner's possession. The Santona (C. C.) 152 Fed. 518. Therefore in legal contemplation the vessel was taken or received from the owner, and not from the charterer.

On the question last stated appellant offers two propositions: (1) The clause refers merely to physical restraint of the ship; an order to the owner is not within its meaning. (2) The order was "ultra vires," meaning that it was not in accord with English municipal or constitutional law.

[6, 7] The first proposition is untenable. In times past, when a vessel left port, she disappeared from her owner's ken; there was no means of communicating with her, except by other ships like her, and electricity and steam did not keep owner and ship in constant touch. In such times force, governmental or other, was more swiftly and more usefully exerted on the ship than on the owner. Now it is more efficacious to act on the ship through the owner, and (so to speak) requisition or commandeer the owner, and through him his vessel, putting upon that owner the same necessity of obedience that in former days was exercised on the master wherever the ship might be. The theory has not changed, but the method of application has been modernized. The fundamental essential of a restraint of rulers is that the restraining act should be governmental. Northern, etc., Co. v. American, etc., Co., 195 U. S. 467, 25 Sup. Ct. 84, 49 L. Ed. 269 et seq. That the restraint need not be physical was in effect held in The Styria, 186 U. S. 18, 22 Sup. Ct. 731, 46 L. Ed. 1027. And see cases cited in The Athanasios, 228 Fed. (D. C.) 558. The matter is fully covered by Lord Reading in Sanday v. British, etc., Co., [1915] 2 K. B. 802, in which case, on appeal to the House of Lords, it was said (in affirming the judgment) that "the circumstances that force was neither exerted nor present [is immaterial], for force is in reserve behind every state demand"; and it was added, in substance, that it would be

"a strange law" which required one to resist, "till the hand of power was laid upon him, an order which it was his duty to obey. If it were an order which he was not bound to obey, and which he might have successfully resisted either by violence or by process of law, a question might arise. * * * "

[8] The evidence here is plain that resistance was impossible; all that Sutherland could have done would have been to say:

"I refuse to order my captain to report to the Admiralty agents; I prefer to leave my ship in the service of a neutral charterer."

The supposed case need not be pursued, to the probable and proper punishment of such an act. No citizen or subject is by lawful private contract either required to or justified in proceeding to such lengths in resisting or evading the compulsion of his government.

[9] The second proposition is equally without support, even though we disregard the multiplied decisions, including our own, regarding the efficacy of the ambassadorial certificate. It is here proven, without any reference to that document, that the act commonly called "requisition" was governmental, and contained or expressed in a letter or order over the signature of the Secretary of the Admiralty. Further, that such letter or order was in assumed compliance with a proclamation dated August 3, 1914, and an Order in Council dated November 10, 1915. Whether in exercising this power the officers sending the telegram, signing letters, and issuing orders were acting in strict accord with the municipal and constitutional law of the United Kingdom, is a question with which we cannot be concerned; for there is plainly proven a governmental act done within British territory, and we, entirely agree with the court below that it is settled law that the act of another sovereign within its own territory is for our purposes legal of necessity. Hewitt v. Speyer, 250 Fed. 370, 162 C. C. A. 437, and cases cited. The requisition of the Claveresk was a restraint of princes, lawful so far as we are concerned to inquire; what legal complaints the owner may seek to advance within the United Kingdom is not our business, nor that of the libelant.

[10] It is next urged that "restraint of princes," etc., does not terminate the charter, nor dissolve the contractual bonds between the parties thereto. Within limits that is true; but no rule can be understood, unless it be measured by the reason for its existence.

Ordinarily that governmental pressure, which is restraint, is but temporary; and the usual restraint clause, such as we have before us, is drawn on that assumption. Thus in Clyde, etc., Co. v. West India, etc., Co., 169 Fed. 279, 94 C. C. A. 551, we found a quarantine detention to be within the restraint clause, and held that such temporary delay did not even stop the daily hire due by charter, not only because the words of the clause did not provide for such stoppage, but because the charterer "had the use of the vessel for which it was to pay, notwithstanding the interruption."

Whether a given act suspends or dissolves a relation is, like most matters, a question of degree. It was well put arguendo by Lord Haldane, when he pointed to the restraint clause as an instance of

providing for the "partial or temporary suspension of certain obligations" of a charter, yet said:

"To the extent to which the perils mentioned interfere with the fulfillment of [charter] obligations, the parties are exempted from liability for nonperformance." Tamplin, etc., Co. v. Anglo-Mexican, etc., Co., [1916] 2 A. C. 397, at pages 406–409.

Evidently the interference may be total; it may amount to prevention.

The same kind of restraint, the same act of power, may at one time or in one instance produce but a temporary delay, changing the contractual obligations of no one, and at another time, or when operating on other attending circumstances, may so change the relation of parties as to destroy the contract itself.

[11] In referring to decisions or authoritative reasoning on this whole subject, it must be remembered that a charter party, a bill of lading, a freight contract, and most written agreements affecting ships as vehicles of commerce, are "mercantile contracts" (Dorrance v. Barber, 262 Fed. 489, —— C. C. A. ——), and the same words in all the various contract writings of that kind should and usually do receive the same construction (The G. R. Booth, 171 U. S. 460, 19 Sup. Ct. 9, 43 L. Ed. 234). Bearing this in mind, The Styria, 186 U. S. 1, 22 Sup. Ct. 731, 46 L. Ed. 1027, and The Kronprinzessin Cecilie, 244 U. S. 12, 37 Sup. Ct. 490, 61 L. Ed. 960, are modern instances of how apprehension of restraint, something much less than actual governmental compulsion, may suffice to dissolve the obligation of a contract.

Contracts of carriage, voyage charters, and other short term agreements may be terminated by "restraint of rulers," as well as any other exception, if there is enough of it; but since the bald fact of any restraint does not per se terminate (for the sufficient reason that it was not intended so to do), the effect of the clause on time charters is unsatisfactory, because uncertain. The written charter party long commonly used, and of which the one at bar is an instance, does not contemplate a compulsory governmental use extending over years; no such thought was present to the mind of its draftsman, and indeed the thing is still terrifyingly new. This is shown by the internal evidence furnished by the document, and is historically a matter of general knowledge.

The relief afforded by the restraint clause is also too slow; one party always demands, both parties ought to ask, and in the interest of the public the law insists on knowing: How does the contract stand eo instanti the ship is taken away? Is the private contract living or dead, and, if dead, what killed it? This question cannot be answered by reference to the restraint clause, or any other expressed term of the written contract; therefore another legal creation, and one underlying the words chosen by the parties, is appealed to, and we find that this charter party ended or died, and its obligations were forever dissolved, on February 10, 1917, because the commercial adventure was then frustrated.

This phrase is said to have been born in the judgment in Jackson v. Union Marine Ins. Co., L. R. 10 C. P. 125 (Bank Line v. Capel [1919]

1 A. C. 457); it has been the subject of recent exhaustive discussion in the House of Lords (Horlock v. Beal [1916] 1 A. C. 486, and the Tamplin & Bank Line Cases, supra), and the doctrine was recently applied in The Allanwilde, 248 U. S. 377, 39 Sup. Ct. 147, 63 L. Ed. 312, 3 A. L. R. 15, and Lewis v. Mowinckel, 215 Fed. 710, 132 C. C. A. 88. It is so authoritatively held in the cases cited, and those on which they rely, that the doctrine of frustration applies to a variety of maritime contracts including time charters, that more than mention of the fact scarcely seems necessary. In our judgment the justification for the holdings is best expressed by Lord Sumner (Bank Line Case, at page 454), in saying:

"Rights ought not to be left in suspense or to hang on the chances of subsequent events. The contract binds or it does not bind, and the law ought to be that the parties can gather their fate then and there."

But since parties almost never agree about it, courts must ascertain fate for them, by (says Lord Loreburn, in Tamplin Case at page 404) inferring, "from the nature of the contract and the surrounding circumstances, that a condition not expressed was a foundation on which the parties contracted." It follows naturally that, when the foundation is removed the superincumbent contract falls and dies; it is killed by that malignant disease—a change of circumstances. It may also be accepted on authority that frustration of adventure and termination of contract may be the instant result of an act which may be properly described as "restraint of princes," etc. Bank Line Case, at page 442.

Applying these rules to the facts before us, it being true that government on February 10, 1917, made it impossible for either Sutherland, Earn Line, or any other private individual to use the Claveresk, and did this under circumstances clearly showing to any sensible man that such indefinite taking would almost certainly outlast the life of the charter, it further appearing that the boat was so retained far beyond the charter period, and indeed (by admission at bar) still is kept by government (cf. Bank Line Case, at page 454), it follows as a conclusion of law that the charter party was terminated by frustration on February 10, 1917.

Although this result has been worked out in the highest British court with an enormous expenditure of writing, an examination of the case law relied on shows that the doctrine of frustration as applied to time charters is regarded as a logical outcome of the Union Marine Insurance Case, supra, and Geipel v. Smith, L. R. 7 Q. B. 404, which are likewise the precedents forming the foundations of The Styria, supra, and kindred decisions.

[12] Indeed, we cannot think the doctrine new except in phraseology and application; for it is elementary that among the ways in which any contract ends and is dissolved is the cessation of existence of some thing, condition, or state of things, upon the continued existence of which the contract was known to depend, provided such cessation of existence arises without fault in either contracting party. Jenks, Dig. English Civil Law, bk. 2, part 1, § 297, citing cases.

In the present instance, what ceased to exist was Sutherland's control of the Claveresk; that swept away the foundation of contract,

as thoroughly as might a fire or shipwreck. All arguments leading to an opposite result, all suggestions that such charter as this survived February 10, 1917, make of the superior force that removed every reasonable chance of doing what both parties expected to do when they agreed together, no more than an option to cancel, to be exercised after a nice calculation of possible loss or gain, by owner or charterer as the case may be. Indeed, there seems nothing left to cancel but a chance of loss; for never is it admitted that any portion of the charter survived seizure except the chance of gain. No suggestion of sharing loss is admitted.

But a charter party is not a partnership agreement, nor is it primarily an agreement for money payments; it is a promise to serve with and by a named ship, and when the ship is gone the charter is ended; and all the law can do is to apportion blame for the loss, guiding inquiry, first, by the words of the agreement; and, second, by the implications of underlying inherent conditions presumed to be common to sensible and honest men. It is impossible to imagine such men even wishing to agree that if government pays a high price, the advance goes all to one, while if a low price is paid, the burden falls only on the other. "Heads I win, tails you lose," as a bargain, is beyond the pale of implication.

For these reasons, libelant can take nothing by this libel. That pleading rests solely on a breach, called a "repudiation" by the pleader; this is another of the ways in which a contract ends or dies, in which case the breach gives rise to damages. A breach is a wrong, but there was no breach, therefore there can be no damages.

[13] This situation libelant sought to prevent by proffering the "replication" above described. That pleading was not entitled to filing, because not allowed under the fifty-first rule in admiralty (29 Sup. Ct. xliv).

[14, 15] Nor should it have been allowed if applied for, because in so far as it denied matter in the answer, it was unnecessary; and in so far as it claimed from Sutherland the difference between charter hire and admiralty payments, it was not and could not be a replication. It is really an attempt to set up a new cause of action, wholly inconsistent with that propounded in the libel. The trial court properly disregarded the paper.

[16] The legal inquiry suggested by the second part of this "replication" is whether Earn Line has any claim of any sort to whatever Sutherland gained because the admiralty payments turned out to be higher than those stipulated in the charter party. The subject is one whose difficulty has not been diminished by such dicta as that of Lord Loreburn (who to be sure was holding a charter not dissolved) that the owner will be "accountable to the charterers" for such sums as he might receive from government; while Lord Atkinson held that what was so paid came "from the bounty of the crown, they have no legal right to it" (Tamplin Case at pages 405, 422); but we are not required, nor indeed permitted, to attempt solution.

This libel was brought, and, after pleading a breach, could be brought, for libelant's damages only; what is now demanded is re-

spondent's alleged profits. Profits are not damages, and Sutherland's gains are not Earn Line's losses. The first statement is elementary law; the second is a fact obvious from the evidence. Whether, after a contract is dissolved without fault in either party, there can therefrom arise or remain any contractual relation between the parties, except for matters preceding dissolution; whether, if such a demand as has been stated exists at all, it is legal or equitable (cf. Agency, etc., Co. v. American, etc., Co., supra); whether admiralty has any jurisdiction affording recovery either of the certain sum suggested by the "replication" or of a sum reachable only on accounting; whether Earn Line's demand is affected by the subcharter; and what are the rights of the subcharterer—are questions not before us on the pleadings, and matters on which the apostles are empty of sufficient evidence to justify findings, were they permissible.

We hold, then, only that no breach of charter party has been shown, wherefore no damages can be recovered, and damages only were demanded. Beyond this it is not necessary to go; if these findings are at variance with some of the reasoning of the learned court in The Isle of Mull (D. C.) 257 Fed. 798, we prefer the views above expressed; but we are not informed as to the pleadings in that case.

Decree affirmed, with costs.