**PIERSON & CO., Inc., v. IWAI & CO., Limited.**

(District Court, S. D. New York. April 26, 1920.)

1. Sales ⬅176(1)—Time of delivery is of essence of contract and waiver must be clear.

In a mercantile contract for the sale of an article to be manufactured and delivered within a stated period, time is of the essence, and while it may be waived a waiver must be based on a clear intention, and requires a consideration, or action on the part of the party in whose favor the waiver is made, creating an estoppel.

2. Sales ⬅89—Waiver of time for delivery held conditional.

Extension of time by the buyer for delivery of structural steel bought for export *held* a waiver of time only on condition of delivery before expiration of an export license held by the buyer.

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
285 F.—49

At Law. Action by Pierson & Co., Inc., against Iwai & Co., Limited. Judgment for defendant.

Affirmed 285 Fed. 774. See, also, 285 Fed. 773.

Hill, Lockwood & Redfield, of New York City (Dominic B. Griffin, of Brooklyn, N. Y., of counsel), for plaintiff.

Murray & Hollaman, of New York City (R. D. Murray, of New York City, of counsel), for defendant.

AUGUSTUS N. HAND, District Judge. This is an action to recover damages for failure to take and pay for certain steel channels and angles which the defendant contracted to purchase under two separate contracts dated July 17, 1917. The shipments, by the terms of each contract, were to be during the last quarter of the year 1917, and the delivery f. o. b. cars South Bethlehem, Pa. Each contract provided for certain marks to be placed on the goods in the event that the mill from which the plaintiff was to procure the channels and angles "agrees to furnish the goods for export." It appears from the correspondence that the mill would not agree to furnish the goods for export, and the defendant requested that the steel be shipped to New York, where the defendant was to take and ship it to Japan under its own supervision. The following terms were a part of each order:

"Please render your invoices to us in quadruplicate, in advance, that is, as soon as the goods are ready for shipment, and we will apply for license, which we will immediately forward to you, so that you have federal authority in hand to load goods on cars. Documents, that is, bill of loading attached to your invoice in duplicate, may then be presented to our bankers for payment as usual. In the event, however, that when the goods are ready for shipment, you are absolutely unable to obtain cars, we will arrange to have our bankers remit to you against your invoices only."

The defendant obtained and forwarded to plaintiff export licenses on August 24, 1917, expiring October 23, 1917 (Plaintiff's Exhibits 15 and 16). On October 19, 1917 (Plaintiff's Exhibit 33), defendant notified plaintiff of further export licenses which are stated to have expired December 1, 1917. On November 5, 1917 (Plaintiff's Exhibit 37), plaintiff wrote defendant that according to the mill's advices they expected to have certain of the steel delivered in "January next" and that "the above deliveries and rollings are subject to any government demands that might interfere."

On November 22, 1917, plaintiff wrote that the "rolling of the angles will be delayed until the first week in December. Therefore we will be unable to ship during the life of this license. We request that you kindly make application for renewal of license good for 60 days or longer, if possible, covering material on your contracts. * * *" On November 28, 1917, the defendant wrote plaintiff that it had licenses, expiring January 2, for the steel angles on the second contract and for one-half the channels on the first contract, but not for the 8-inch channels, which represented the other half, and said: "Regarding eight (8) inch channels we will advise you later on" (Plaintiff's Exhibit 39).

On January 8, 1918, the defendant wrote that it had extended the license on steel angles to January 25, and requested plaintiff to "check"

all orders for steel angles not yet completed (Plaintiff's Exhibit 40). On January 22, 1918, plaintiff wrote, asking to have license renewed or extended, and saying that the mill, owing to fuel shortage, would be unable to start before January 28, "so it will be utterly impossible for us to make any shipments against this license" expiring January 25 (Plaintiff's Exhibit 41).

Nothing was said by either party until February 23, 1918, when plaintiff wrote that the mill said that it believed it could produce this tonnage for defendant within the next 3½ to 4 weeks providing government orders did not interfere (Plaintiff's Exhibit 42). This letter was answered by defendant on February 25, 1918, as follows:

"We have before us your letter of the 23d inst., advising us that your mill expects to have the tonnage applying on our contracts Nos. 364 and 365 ready for shipment within the next three or four weeks. In this connection, we wish to inform you that we turned in application for extension of license covering this material, but up to the present moment we have not received such extension" (Plaintiff's Exhibit 43).

On March 5, 1918, the plaintiff wrote, asking again for an extension of the licenses, and saying:

"We are of the belief that we will be able to roll the 7" channels in about two to three weeks, the 8" channels in six or seven weeks, and the 5x3" angles in about three to four weeks; so, therefore, we request that you endeavor to get the license to cover this period and we will be able to accumulate and ship" (Plaintiff's Exhibit 44).

On March 23 the defendant wrote that it could not obtain licenses and asked for cancellation of the contract (Plaintiff's Exhibit 46). On March 26 the plaintiff wrote, refusing to cancel, saying it was already committed to the mill, and adding:

"We think the easiest and best way out of the matter would be for you to authorize us to proceed with the execution of these orders, in which event we would have the material rolled within about four weeks and shipped within that time * * *" (Plaintiff's Exhibit 47).

On April 4, 1918, the defendant again wrote, asking for cancellation of the contract. While the failure to obtain export licenses could furnish no legal excuse · for not accepting delivery, it does afford an abundant explanation of defendant's conduct. The defendant wished to purchase goods, because it desired to export them, and doubtless would not have cared to purchase them otherwise. While the plaintiff might have tendered the steel within the last quarter of 1917, irrespective of any license, and while a license was only important to the defendant because it wished to export the goods, yet, in determining whether the defendant intended an unconditional waiver of the provisions as to time of delivery, the matter of the export licenses has an important bearing. The ·final arrangement between the parties was that the plaintiff should place the goods on cars at South Bethlehem, Pa., for New York City, and that this should be done during the last quarter of 1917.

[1] In a mercantile contract of this kind the time of performance was undoubtedly of the essence. While it could be waived, a waiver must be based upon clear intention, and, as it would affect an essential

term of the contract, requires a consideration or action on the part of the party in whose favor the waiver is made creating an estoppel. Dorrance v. Barber & Co. (C. C. A.) 262 Fed. 489; Connell Bros. Co. v. Diederichsen & Co., 213 Fed. 737, 130 C. C. A. 251; Emerson v. Slater, 22 How. 41, 16 L. Ed. 360; Bennecke v. Insurance Co., 105 U. S. 355, 26 L. Ed. 990; Underwood v. Farmers Joint Stock Insurance Co., 57 N. Y. 500; Frankfurt-Barnett Co. v. William Prym Co., 237 Fed. 21, 150 C. C. A. 223; L. R. A. 1918A, 602.

[2] The letters of the plaintiff of November 5th and 22d, suggesting that some of the deliveries could not be made until January, 1918, when followed by defendant's letter of November 28th, are perhaps evidence of a waiver as to such steel as might be delivered after January 1, 1918, provided the defendant could secure licenses enabling it to export the same. In other words, any evidence which might be regarded as showing an intention to waive the provision as to time of performance can substantiate no more than a waiver conditional upon the ability of the defendant to secure export licenses. Moreover, there is nothing to show that the plaintiff incurred any new obligations by reason of any intimation of the defendant that it would accept goods after January 1st. It is quite clear that the order the plaintiff had given its mill had never been fulfilled and the steel had not been rolled in whole or in part even as late as April, when the defendant definitely refused to take the goods.

There is no express waiver, and, if any is to be implied from the correspondence, the only reasonable and just inference is that the defendant would take later deliveries, if it found that the steel could be exported. To enable a party hopelessly in default under its contract to recover large damages upon such a shadowy waiver as is sought to be established here, and particularly under circumstances where it never changed its position by reason of the defendant's conduct, would be wholly unwarranted. Even as late as March 26, 1918, when about three months had elapsed beyond the time of performance called for by the contract, the plaintiff wrote that the mill could not deliver until four weeks later.

The plaintiff seeks to change an express provision for delivery within a stated time into a contract calling only for delivery within a reasonable time. In my opinion the evidence does not warrant such an inference, and the plaintiff must fail.