## BALLINGER OIL MILL, Inc., et al. v. SOUTHERN COTTON OIL CO.

Circuit Court of Appeals, Fifth Circuit. January 28, 1930.

No. 5507.

R. F. Spencer, of San Antonio, Tex., and M. H. Boynton, of Fort Worth, Tex. (Doss & Boynton, of Ballinger, Tex., and R. F. Spencer and Spencer, Rogers & Lewis, all of San Antonio, Tex., on the brief), for appellants.

Henry E. Jackson and Scott Snodgrass, both of San Angelo, Tex. (Collins, Jackson & Snodgrass, of San Angelo, Tex., on the brief), for appellee.

Before BRYAN and FOSTER, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge. Plaintiff brought this suit to recover back from defendants the sum of $3,902.60, paid to them as the price of a tank car of cotton seed oil, upon the ground that it had been lost in transit through the fault of the defendant in not properly inspecting said car according to its agreement to see that the outlet in the bottom was securely closed.

Defendant, after admitting the sale and payment of the purchase price, made a general denial as to its liability, and specially pleaded that it had carefully inspected the car and its equipment according to the usual custom, and that the loss was occasioned through the fault of some one else after shipment.

The undisputed facts are that this car of oil was purchased by the plaintiff from defendant at Ballinger, Tex., through a broker, and it was stipulated that the sale should be governed by the rules of the Interstate Cotton Seed Crushers' Association with respect to inspection, loading, etc.; that the car arrived at the plant of defendant on December 17, 1926; that loading was commenced about 8:30 o'clock in the morning of the 18th and was finished about 2:30 p. m. of the same day; that the cap on the outlet pipe at the bottom of the car was not removed and allowed to hang by its chain as required by the shipping instructions; that the car moved out of defendant's yard about 5 o'clock p. m. of the day of its loading; that it reached a junction point at Brownwood, Tex., some 80 miles distant, about 2:30 a. m. of the 19th and moved out about 2:15 of the 20th; that the train in which it moved was inspected there, and, while there is no notation on the inspector's report as to this car, he testified that it was in good order and the cap was on the outlet pipe or else it would have been noted; that some time on the 22d—the exact hour does not appear in the record—but in the daytime, the train containing this car of oil reached the city of Temple, Tex., about 200 miles from Ballinger; that an employee of the railroad saw it as it passed over the crossing with another company, and at that time the cap was swinging by its chain and a full flow of oil was pouring out of the pipe; that this employee, although not part of his duties, immediately obtained a crew of men, removed the dome cap and endeavored to close the valve in the bottom of the car, but was unable to do so; that he then reported the matter to the car repair department, and, when the crew thereof reached the tank car in question, its entire contents had leaked out; that they also found the cap swinging by its chain and the valve outlet open; that a nut on the valve stem was screwed up so tight that it made the stem too short to reach into the outlet when lowered by the handle above; and that the nut was loosened and the stem lengthened, as a result of which the valve could be and was easily closed.

The case was submitted to a jury, which gave a verdict for the full amount claimed, and, after the overruling of a motion for a new trial, the defendant appealed.

Defendant has assigned as error, first, the refusal of the court to strike from plaintiff's petition certain rules of the Interstate Cotton Seed Crushers' Association, which were copied therein, for the reason, as contended, the same amounted to an attempt by contract to oust the jurisdiction of the courts, and, in the light of the charges subsequently given by the court, operated to its prejudice by inducing the jury to believe that the failure of defendant to comply with said rules made it liable, regardless of whether or not said failure contributed to or was the proximate cause of the loss. Both the broker's memorandum and the letter of confirmation of the plaintiff, to which defendant must be held to have consented, provided that the transaction should be governed by said rules. In addition thereto, the confirmatory letter, in giving instructions as to loading, specifically required:

"After removing dome cover, the outlet valve should be examined to ascertain if it is properly seated and that the valve rod is securely attached to the valve and is operative from the dome.

"Before any oil is loaded the outlet cap should be removed and allowed to hang by the chain until tank has been loaded, which will quickly indicate whether valve is properly seated.

"Before loading refined oil, in addition to the above the steam coils should be thoroughly tested (preferably with air) to detect any leaks, and if any are found they should be repaired and the coils made tight under pressure.

"After loading has been completed, the outlet cap should be reapplied and screwed tight, and care should be exercised to see that the steam coil connection caps are also securely applied. Both dome cover and outlet cap should then be sealed."

One of the applicable rules (No. 2) also provided as follows:

" * * * Seller will be responsible for loss in transit of commodities shipped in tank cars if seller has failed to comply with instructions regarding loading of tank cars. * * * "

Section 2 of Rule 118 declares:

"The shipper is required to inspect all tank cars before loading, to see that all mechanical parts are in good condition, especially steam pipes, coils, outlet pipes and outlet valves. Where cars are found to be defective they shall not be loaded until buyer has been notified by wire and specifically authorizes their loading. The shipper shall also inspect cars after loading to see that the valves are properly seated and caps are properly applied to outlet pipes, that caps or plugs are properly applied to steam pipes, that dome covers are properly applied.

"Failure to observe the foregoing shall constitute negligence on the part of the shipper, and shall relieve the buyer from responsibility for any and all loss or damage resulting therefrom."

Defendant further contends that it was error for the lower court to charge that the burden was upon defendant to show that it had complied with its contract as to the manner of loading the car, as well as the refusal to charge that the burden was upon the plaintiff at all times, and, unless it showed that the defendant's failure to take the cap off the outlet pipe was the proximate cause of the loss, plaintiff could not recover, even if the valve stem was not properly set, provided defendant had screwed the cap on securely; it being contended that the evidence showed the oil could not escape in transit if the cap was so applied unless it was disturbed by some human agency.

Of course parties cannot make contracts that will deprive the courts of jurisdiction or power to decide their controversies when they arise, but we see no reason why, in circumstances like these, where the loading of a tank car was to be by the seller, in whose power it would be to take the necessary precautions and safeguards against loss, and who would also be in possession of all the evidence as to what was done, a stipulation could not be made which would compel it to assume the risk if it did not perform those things which were reasonably necessary to prevent the loss. The requirement of the shipping instructions authorized by the rules with respect to the removal of the outlet cap was one calculated to make certain that the valve would be closed when the oil was pumped into the car, for the simple reason that, if it was not, the oil would run out and be discovered immediately. On the other hand, if it was left screwed on, and any one attempted to set the valve stem to close the outlet from the dome cap, he might easily be mistaken in thinking it was closed when it was not. In the light of the undisputed facts, which we have outlined above, we are convinced, as was no doubt the jury below, that this is exactly

what happened. No one got into the car, but the effort to close the valve was made from the dome cap and with only such chance to see as that situation afforded. It was found after the outlet cap had come off and the oil had been lost that, because of a nut having been screwed up too tight, the valve stem was too short to close the opening until it was lengthened. The evidence further showed that there was a small amount of oil in the car before loading was started, which almost came up to the top of the nut on the lower end of the valve stem, and we have no doubt the man who attempted to close it honestly believed he had succeeded; whereas, if he had removed the cap from the outlet pipe as required by the rules and shipping instructions, he would have at once discovered his mistake. In view of these considerations, we cannot see how any one could say that the requirement was either unreasonable or an attempt to take away from the courts their jurisdiction to determine the rights of the parties. We are justified, we think, in assuming the experience of members of the association and men engaged in the business, had been such as to require provision against contingencies wherein attempts would be made to shift responsibility from one party to the other. The difficulties which they sought to meet are apparent, such as the fact that the cars would often have to pass through the hands of two or more connecting railroads, with the consequent trouble in obtaining evidence to establish liability, when, by the simple expedient of complying with this requirement, all question as to whether the valve had been closed would be eliminated. We do not think it necessary to go into an extended discussion of legal principles, but find it sufficient to say that the requirement was reasonable and for a substantial purpose, and one to which the parties were at liberty to agree, if not complied with, should place the risk upon the seller. We therefore conclude that there was no error, either in the refusal to strike the allegations from the petition, or in the charge that the burden was upon the defendant to show that it had taken the precautions required by its contract, and, if not, then it had assumed the risk of loss. Baltimore & Ohio Southwestern Ry. Co. v. Voight, 176 U. S. 498, 20 S. Ct. 385, 44 L. Ed. 560; Dorrance et al. v. Barber & Co., Inc. (C. C. A.) 262 F. 489.

The conclusions which we have thus reached make it unnecessary to consider the remaining assignments, and, finding no error otherwise in the rulings of the lower court, the judgment is affirmed.